UNITED STATES of America,

v.

John Phillip Walker LINDH.

No. Crim. 02–37–A.

United States District Court,
E.D. Virginia,
Alexandria Division.

July 11, 2002.

Randy Bellows, United States Attorney's Office, Alexandria, VA, for plaintiff.

William Bruce Cummings, David Thomas Williams, William B. Cummings, P.C., Alexandria, VA, James Brosnahan, San Francisco, CA, for defendant.

### *MEMORANDUM OPINION*

ELLIS, District Judge.

John Phillip Walker Lindh ("Lindh") is an American citizen who, according to the ten-count Indictment filed against him in February 2002, joined certain foreign terrorist organizations in Afghanistan and served these organizations there in combat against Northern Alliance and American forces until his capture in November 2001. In seven threshold motions, Lindh sought dismissal of certain counts of the Indictment on a variety of grounds, including lawful combatant immunity and selective prosecution. Lindh also sought dismissal, or alternatively, transfer of venue, arguing that he could not receive a fair trial in this district owing to pre-trial publicity. All motions were denied following extensive briefing and oral argument. *See United States v. Lindh,* Criminal No. 02–37–A (E.D.Va. June 17, 2002) (Order). Recorded here are the reasons underlying those rulings.[1]

### I.

The Indictment's allegations may be succinctly summarized. In mid–2001, Lindh attended a military training camp in Pakistan run by Harakat ul-Mujahideen ("HUM"), a terrorist group dedicated to an extremist view of Islam.[2] After receiving several weeks of training, Lindh informed HUM officials that "he wished to fight with the Taliban[3] in Afghanistan." Indictment. p. 6, ¶ 5. Thus, in May or June 2001, he traveled from Pakistan into Afghanistan "for the purpose of taking up arms with the Taliban," eventually arriving at a Taliban recruiting center in Kabul, Afghanistan—the Dar ul-Anan Headquarters of the Mujahideen. Indictment, p. 7, ¶ 6. On his arrival, Lindh presented a letter of introduction from HUM and advised Taliban personnel "that he was an American and that he wanted to go to the front lines to fight." Indictment, p. 7, ¶ 7.

While at the Dar ul-Anan Headquarters, Lindh agreed to receive additional and extensive military training at an al Qaeda[4] training camp. He made this decision "knowing that America and its citizens were the enemies of Bin Laden and al-Qaeda and that a principal purpose of al-Qaeda was to fight and kill Americans." Indictment, p. 7, ¶ 8. In late May or June 2001, Lindh traveled to a bin Laden guest

---

1. Thus, this Memorandum Opinion elucidates and amplifies the rulings issued orally from the bench at the conclusion of the hearing on the motions.

2. On October 8, 1997, HUM was designated by the Secretary of State as a foreign terrorist organization, pursuant to Section 219 of the Immigration and Nationality Act. *See* 62 Fed. Reg. 52650 (1997).

3. According to the Indictment, the Taliban is Afghanistan's dominant political force and its members, like the members of HUM, practice an extremist form of Islam. Specifically, members of the Taliban believe in conducting "jihad," or holy war, against those whom they

believe threaten their form of Islam, including the United States.

4. The Indictment alleges that al Qaeda is an organization, founded by Osama bin Laden and others, that is dedicated to opposing non-Islamic governments with force and violence. On October 8, 1999, al Qaeda was designated by the Secretary of State as a foreign terrorist organization, pursuant to Section 219 of the Immigration and Nationality Act. *See* 64 Fed. Reg. 55112 (1999). The Secretary of State has also declared al Qaeda a "specially designated terrorist," pursuant to the International Emergency Economic Powers Act. *See* 66 Fed.Reg. 54404 (2001).

house in Kandahar, Afghanistan, where he stayed for several days, and then traveled to the al Farooq training camp, "an al Qaeda facility located several hours west of Kandahar." Indictment, p. 7 ¶ 10. He reported to the camp with approximately twenty other trainees, mostly Saudis, and remained there throughout June and July. During this period, he participated fully in the camp's training activities, despite being told early in his stay that "Bin Laden had sent forth some fifty people to carry out twenty suicide terrorist operations against the United States and Israel." Indictment, p. 7, ¶ 11. As part of his al Qaeda training, Lindh participated in "terrorist training courses in, among other things, weapons, orienteering, navigation, explosives and battlefield combat." Indictment, pp. 7–8, ¶ 12. This training included the use of "shoulder weapons, pistols and rocket-propelled grenades, and the construction of Molotov cocktails." Indictment, p. 8. ¶ 12. During his stay at al Farooq, Lindh met personally with bin Laden, "who thanked him and other trainees for taking part in jihad." Indictment, p. 8, ¶ 13. He also met with a senior al Qaeda official. Abu Mohammad Al–Masri, who inquired whether Lindh was interested in traveling outside Afghanistan to conduct operations against the United States and Israel. Lindh declined Al–Masri's offer in favor of going to the front lines to fight. It is specifically alleged that Lindh swore allegiance to jihad in June or July 2001.

When Lindh completed his training at al Farooq in July or August 2001, he traveled to Kabul, Afghanistan, where he was issued an AKM rifle "with a barrel suitable for long range shooting." Indictment, p. 8, ¶ 16. Armed with this rifle, Lindh, together with approximately 150 non-Afghani fighters, traveled from Kabul to the front line at Takhar, located in Northeastern Afghanistan, where the entire unit was placed under the command of an Iraqi named Abdul Hady. Lindh's group was eventually divided into smaller groups that fought in shifts against Northern Alliance troops in the Takhar trenches, rotating every one to two weeks. During this period, Lindh "carried various weapons with him, including the AKM rifle, an RPK rifle he was issued after the AKM rifle malfunctioned, and at least two grenades." Indictment, p. 8, ¶ 19. He remained with his fighting group following the September 11, 2001 terrorist attacks, "despite having been told that Bin Laden had ordered the [September 11] attacks, that additional terrorist attacks were planned, and that additional al Qaeda personnel were being sent from the front lines to protect Bin Laden and defend against an anticipated military response from the United States." Indictment. p. 9, ¶ 20. Indeed, it is specifically alleged that Lindh remained with his fighting group from October to December 2001, "after learning that United States military forces and United States nationals had become directly engaged in support of the Northern Alliance in its military conflict with Taliban and al Qaeda forces." Indictment, p. 9, ¶ 21.

In November 2001, Lindh and his fighting group retreated from Takhar to the area of Kunduz, Afghanistan, where they ultimately surrendered to Northern Alliance troops. On November 24, 2001, he and the other captured Taliban fighters were transported to Mazar–e–Sharif, and then to the nearby Qala–i–Janghi (QIJ) prison compound. The following day, November 25, Lindh was interviewed by two Americans—Agent Johnny Micheal Spann from the Central Intelligence Agency (CIA) and another government employee. Later that day, it is alleged that Taliban detainees in the QIJ compound attacked Spann and the other employee, overpowered the guards, and armed themselves. Spann was shot and killed in the course of the uprising and Lindh, after being wounded, retreated with other detainees to a

basement area of the QIJ compound. The uprising at QIJ was eventually suppressed on December 1, 2001, at which time Lindh and other Taliban and al Qaeda fighters were taken into custody by Northern Alliance and American forces.

Following his capture, Lindh was interrogated, transported to the United States, and ultimately charged in this district with the following offenses in a ten-count Indictment:

(i) conspiracy to murder nationals of the United States, including American military personnel and other governmental employees serving in Afghanistan following the September 11, 2001 terrorist attacks, in violation of 18 U.S.C. § 2332(b)(2) (Count One);

(ii) conspiracy to provide material support and resources to HUM, a foreign terrorist organization, in violation of 18 U.S.C. § 2339B (Count Two);

(iii) providing material support and resources to HUM, in violation of 18 U.S.C. § 2339B and 2 (Count Three);

(iv) conspiracy to provide material support and resources to al Qaeda, a foreign terrorist organization, in violation of 18 U.S.C. § 2339B (Count Four);

(v) providing material support and resources to al Qaeda, in violation of 18 U.S.C. § 2339B and 2 (Count Five);

(vi) conspiracy to contribute services to al Qaeda, in violation of 31 §§ C.F.R. 595.205 and 595.204 and 50 U.S.C. § 1705(b) (Count Six);

(vii) contributing services to al Qaeda, in violation of 31 C.F.R. §§ 595.204 595.204 and 595.205 and 50 U.S.C. § 1705(b) and 18 U.S.C. § 2 (Count Seven);

(viii) conspiracy to supply services to the Taliban, in violation of 31 C.F.R. §§ 545.206(b) and 545.204 and 50 U.S.C. § 1705(b) (Count Eight);

(ix) supplying services to the Taliban, in violation of 31 C.F.R. §§ 545.204 and 545.206(a) and 50 U.S.C. § 1705(b) and 18 U.S.C. § 2 (Count Nine); and

(x) using and carrying firearms and destructive devices during crimes of violence, in violation of 18 U.S.C. §§ 924(c)(1)(A), 924(c)(1)(B)(ii) and 2 (Count Ten).

At issue are the following seven threshold motions to dismiss or transfer filed by the defense:

(i) motion to dismiss or, in the alternative, to transfer venue based on pretrial publicity;

(ii) motion to dismiss Count One for failure to state a violation of the charging statute;

(iii) motion to dismiss Counts Six, Seven, Eight and Nine as lacking statutory, authority;

(iv) motion to dismiss Counts Eight and Nine for selective prosecution;

(v) motion to dismiss Counts Two through Nine on freedom of association, overbreadth, and vagueness grounds;

(vi) motion to dismiss Counts Two, Three, Four and Five for failure to state a claim under the charging statute; and

(vii) motion to dismiss Count Ten on the ground that Lindh did not commit a crime of violence.

Each motion is separately addressed.

## II.

Lindh requests dismissal of the Indictment on the ground that the media attention surrounding this case has been so prejudicial as to deprive him of his Sixth

Amendment right to a fair trial. He alternatively requests a transfer of venue to the Northern District of California, the district in which he spent his childhood and where he claims the pre-trial publicity has not been as prejudicial as it has been in this district. Lindh also claims that the Northern District of California is more convenient for the parties and witnesses, pursuant to Rule 21(b), Fed.R.Crim.P.

The principles that govern resolution of this motion are clear and well settled. The Sixth Amendment guarantees that in all criminal prosecutions, the defendant shall enjoy the right to trial "by an impartial jury." U.S. Const. amend. VI. In certain extraordinary, circumstances, this fundamental right to trial "by an impartial jury" may be compromised by the presence of pervasive and inflammatory pre-trial publicity. *See Chandler v. Florida,* 449 U.S. 560, 574, 101 S.Ct. 802, 66 L.Ed.2d 740 (1981); *Rideau v. Louisiana,* 373 U.S. 723, 726–27, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963). And, in this respect, the "burden of establishing prejudicial pre-trial publicity rests on him who asserts it." *Wansley v. Slayton,* 487 F.2d 90, 94 (4th Cir.1973). To warrant a dismissal of an indictment on this ground, a defendant must establish that he cannot obtain a fair trial anywhere in the country owing to prejudicial pre-trial publicity. *See United States v. Abbott Laboratories,* 505 F.2d 565, 571 (4th Cir.1974). In other words, dismissal is appropriate only where a defendant establishes that prejudicial pre-trial publicity is "so widespread and pervasive that a change of venue would be ineffective to assure a defendant a fair trial." *Id.* In this regard, it is important to note that "[s]heer volume of publicity alone does not deny a defendant a fair trial." *United States v. Bakker,* 925 F.2d 728, 732 (4th Cir.1991) (citing *Dobbert v. Florida,* 432 U.S. 282, 303, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977)). Moreover, it is also important to distinguish between factual and inflammatory pre-trial publicity, as it is chiefly the latter that is fraught with the potential for poisoning the venire. *See Murphy v. Florida,* 421 U.S. 794, 801 n. 4, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975).

Dismissal of an indictment as a remedy for prejudicial pre-trial publicity is severe and rarely warranted, as it is unlikely that fair and impartial jurors cannot be found in any district. The less severe remedy of transfer is also unwarranted unless a defendant can show that the pre-trial publicity in the district "is so inherently prejudicial that trial proceedings must be presumed to be tainted." *Bakker,* 925 F.2d at 732. And, significantly, "[o]nly in extreme circumstances may prejudice be presumed from the existence of pre-trial publicity itself." *Id.* (citing *Wells v. Murray,* 831 F.2d 468, 472 (4th Cir.1987)). Moreover, transfers of venue based on pre-trial publicity are not often granted, as "the effects of pre-trial publicity on the pool from which jurors are drawn is [generally] determined by a careful and searching voir dire examination." *United States v. McVeigh,* 918 F.Supp. 1467, 1470 (W.D.Okla.1996). Indeed, "[o]nly where voir dire reveals that an impartial jury cannot be impanelled would a change of venue be justified." *Bakker,* 925 F.2d at 732. In this regard, "it is not required ... that jurors be totally ignorant of the facts and issues involved." *Id.* at 734. Rather, "[i]t is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Id.*[5]

5. *See also Irvin v. Dowd,* 366 U.S. 717, 722–23, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961) ("To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can

■ These principles, applied here, compel the conclusion that neither dismissal nor transfer is warranted on the current record of pre-trial publicity. To be sure, this prosecution has understandably occasioned considerable nationwide publicity, and it is likely that few, if any, citizens here in this district, or indeed in any district, will not have read or heard of this case. The parties' submissions,[6] including numerous news articles, leave no doubt on this point: This case has received considerable nationwide media attention. But this fact is, of course, by itself, no reason for dismissal or transfer, for it is not uncommon in the course of voir dire for a venire member to disclose familiarity with a case by virtue of pre-trial publicity. Indeed, this occurs just as often in locally notorious cases as in cases of national interest. Yet, what ultimately matters is not simply whether a potential juror has heard or read about a case, but whether a prospective "juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Irvin v. Dowd*, 366 U.S. 717, 722–23, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). Put another way, all prospective jurors in this case, as in all cases, will be questioned carefully as to what they have seen or read or heard about the case and whether they have formed any opinions or impressions. No juror will be qualified to serve unless the Court is satisfied that the juror (i) is able to put aside any previously formed opinions or impressions, (ii) is prepared to pay careful and close attention to the evidence as it is presented in the case and finally (iii) is able to render a fair and impartial verdict based solely on the evidence adduced at trial and the Court's instructions of law.

■ Just as the sheer volume of pre-trial publicity in this case does not compel dismissal or transfer, neither does the nature of that publicity. A review of the parties' submissions on pre-trial publicity relating to this case discloses that the bulk of the publicity is factual, rather than inflammatory, and hence less likely to poison the venire pool. *See Murphy*, 421 U.S. at 801 n, 95 S.Ct. 2031. 4. No doubt the publicity in this case also includes some expressions of opinions on newspaper editorial pages or the Internet that were specifically designed to inflame or persuade readers. Yet, on the whole, the record does not warrant a conclusion that prejudicial pre-trial publicity has been so "inherently prejudicial that trial proceedings must be presumed to be tainted" or that Lindh cannot receive a fair trial. *Bakker*, 925 F.2d at 732. And, in any event, the proof of this pudding will be the voir dire results; only those prospective jurors found to be capable of fair and impartial jury service after careful voir dire will be declared eligible to serve as jurors. Past experience provides reasonable assurance that more than a sufficient number of qual-

---

lay aside his impression or opinion and render a verdict based on the evidence presented in court.").

6. The parties accuse each other of making inappropriate and prejudicial public statements regarding the instant prosecution. The government argues that the efforts of Lindh's counsel in this regard militate against Lindh's reliance on pre-trial publicity as grounds for dismissal or transfer. *See Bakker*, 925 F.2d at 733 (holding that "a defendant should not be allowed to manipulate the criminal justice system by generating publicity and then using that same publicity to support his claim that the media attention surrounding his case created a presumption of prejudice"). This is as unpersuasive as Lindh's accusation that the government's contacts with the media have been improper and in violation of Local Rule 57(A) and Rule 3.6 of the Virginia Rules of Professional Conduct. A review of the record discloses that neither party's counsel, including the Attorney General, have engaged in improper media contact in connection with this case.

ified, impartial jurors will be identified as a result of the voir dire in this case.[7]

Nor are Lindh's expert reports—one prepared by Neil Vidmar and the other by Steven Penrod—to the contrary; neither persuasively supports dismissal of the Indictment or transfer to another district. Vidmar developed a survey interview questionnaire to assess the impact of pre-trial publicity in this case. He later supervised the Evans McDonough Company in conducting random telephone interviews of 400 individuals in this district and, for comparison purposes, 200 individuals in Chicago, Minneapolis, San Francisco and Seattle.[8] Penrod, on the other hand, conducted a content analysis of the pre-trial newspaper coverage concerning Lindh and other issues, as reported in the two major newspapers circulated in Alexandria (the *Washington Post* and the *Washington Times*) and, for comparison purposes, the two major newspapers circulated in Min-

neapolis (the *Minneapolis Star Tribune* and the *St. Paul Pioneer Press*).[9]

Despite Lindh's arguments to the contrary, the Vidmar report actually supports the conclusion that Lindh is just as likely to receive a fair trial in this district as he is elsewhere in the country. Indeed, Vidmar concludes that "the stated attitudes of jury eligible respondents in Virginia toward Mr. Lindh between April 29 and May 2 did not differ from stated attitudes in the rest of the country." Vidmar Report, p. 22, ¶ 156. Moreover, according to the Vidmar data, approximately three quarters (74%) of the Northern Virginia residents who were polled indicated that they could be fair and impartial if seated as a juror at Lindh's trial.[10] Significantly, this percentage exceeds the corresponding percentage reported by Vidmar for California (68.6%), the jurisdiction to which Lindh seeks a transfer. And, contrary to Lindh's assertions, the fact that a number of the individ-

---

7. Should this not be the case after voir dire, it may be appropriate to reconsider Lindh's motion to transfer.

8. Among the questions asked of the respondents were (i) what information they know about Lindh; (ii) whether they have a strongly favorable, somewhat favorable, somewhat unfavorable or strongly unfavorable opinion of Lindh; (iii) whether they view Lindh as a terrorist, a traitor, a confused young man or a person on a religious journey; (iv) whether they believe Lindh was involved in the death of CIA agent Spann; (v) whether they believe there is a connection between Lindh and the September 11, 2001 terrorist attacks; (vi) whether they knew someone who was killed or injured in the September 11, 2001 terrorist attacks; (vii) whether they believe Lindh is guilty, probably guilty, probably not guilty or definitely not guilty of the charges against him; (viii) whether they would consider a not guilty verdict very acceptable, acceptable, not acceptable or very unacceptable; (ix) what punishment they believe Lindh should receive if found guilty of the charges against him; and (x) whether they could be fair and impartial if seated as a juror at Lindh's trial.

9. Specifically, the newspaper articles were coded as either favorable or unfavorable toward Lindh on a number of issues, including (i) the personal characteristics of Lindh; (ii) Lindh's connections to the Taliban, al Qaeda and bin Laden; (iii) Lindh's connection to the QIJ prison uprising resulting in the death of CIA agent Spann; (iv) the regional economic and emotional impact of the September 11, 2001 attack on the Pentagon; and (v) the instant charges against Lindh.

10. Vidmar attempts to discredit this statistic, arguing that the respondents' assertions of impartiality must be viewed skeptically because such assertions reflect the "culturally learned American view that jurors must be fair." Yet, it is clear that such assertions of fairness and impartiality are entitled to credence and are "not lightly to be discarded." *See Rideau v. Louisiana*, 373 U.S. 723, 732, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963) (J. Clark, dissenting) ("[W]hen the jurors testify that they can discount the influence of external factors and meet the standard imposed by the Fourteenth Amendment, that assurance is not lightly to be discarded.").

uals polled in both Virginia and elsewhere knew someone injured or killed in the September 11, 2001 terrorist attacks does not warrant dismissal of the Indictment or a change of venue. Rather, such personal connections to the terrorist attacks are matters adequately addressed and dealt with during the voir dire process.

The Penrod report also does not support dismissal or transfer of the case. Indeed, on more than half the subjects covered by the survey, the Minneapolis newspapers were either harsher in their assessment of Lindh or expressed "unfavorable" opinions to the same extent as did the Alexandria newspapers. Additionally, on those subjects where the Alexandria newspapers were found to be less favorable toward Lindh than the Minneapolis newspapers, the percentages were often so close as to be statistically insignificant.[11] Penrod's survey is also methodologically flawed in several respects, as he fails to take into account any television or computer generated publicity, or to adjust his conclusions in light of the differences in circulation rates of the newspapers studied.[12] Penrod also places great emphasis on the extensive media attention in the Alexandria newspapers regarding the emotional and economic impact of the September 11, 2001 terrorist attack on the Pentagon. As indicated above, any personal connections of potential jurors to the Pentagon attack, or any of the other September 11, 2001 ter-

rorist attacks, are issues that are appropriately resolved in the course of voir dire. Finally, it is worth noting that Lindh is not entitled to a "favorable" jury, as Penrod appears to suggest; nor is he entitled to a jury that has not been privy to any media reports regarding the instant prosecution, favorable or unfavorable. Rather, what the Sixth Amendment guarantees Lindh, and all criminal defendants, is a fair and impartial jury. *See* U.S. Const. amend. VI. Nothing in the studies and data Lindh submitted supports a conclusion that Lindh cannot receive a fair and impartial jury trial in this district.

■ Lindh's motion to transfer the case to the Northern District of California for purposes of convenience, pursuant to Rule 21(b), Fed.R.Crim.P.,[13] is equally unpersuasive. Indeed, contrary to Lindh's contentions, there are multiple reasons for concluding that transfer from this district is inappropriate, including the following: (i) the trial will proceed more expeditiously in this district; (ii) this district is equipped and prepared to cope with the significant security concerns associated with this case; (iii) the prosecution team is comprised largely of attorneys from this district; (iv) the relevant documents are located in this district; (v) the defendant is present in this district, subject to security measures already in place; and (vi) a number of potential witnesses are located in or near this district.[14] Moreover, the fact that four of Lindh's attorneys reside in Califor-

---

11. For example, compare the percentages of statements deemed unfavorable toward Lindh in the Alexandria newspapers versus those in Minneapolis on the following subjects: (i) Lindh criticizing America (.34 versus .30); (ii) terrorist attacks on the Pentagon (.13 versus .09); (iii) terrorist attacks on the World Trade Center (.19 versus .11); (iv) Lindh's right to counsel (.11 versus .08); (v) the conditions of Lindh's confinement (.09 versus .07); (vi) the QIJ prison uprising (.15 versus .11); and (vii) the death of CIA agent Spann (.17 versus .10). *See* Penrod Report, pp. 29–39.

12. For example, the survey does not assign a greater weight to articles from the *Washing-

ton Post* than to those from the *Washington Times* despite the fact that the daily circulation rate of the *Post* (786,032) is nearly eight times that of the *Times* (approximately 100,-000). *See* Penrod Report, p. 10, ¶ 23.

13. Rule 21(b) provides that "[f]or the convenience of parties and witnesses, and in the interest of justice, the court upon motion of the defendant may transfer the proceeding … to another district." Rule 21(b), Fed. R.Crim.P.

14. Among the factors that may be considered in determining whether a Rule 21(b) transfer

nia rather than in this district is an inconvenience of his own choosing. No claim is made, or can be made, that competent and experienced counsel cannot be found in this district. Of course, Lindh has a Sixth Amendment right to select competent and experienced counsel from another district, which he has done, but he is not entitled to rely on the exercise of that right to effect a change of venue.

In conclusion, it is clear that neither a dismissal of the Indictment nor a transfer of venue is warranted in this case. Specifically, Lindh has failed to meet his burden of establishing that the pre-trial publicity generated in this case, by both the government and the defense, "has been so inflammatory and prejudicial that a fair trial is absolutely precluded and [the] indictment should be dismissed without an initial attempt ... to see if an impartial jury can be impanelled." *Abbott*, 505 F.2d at 571. He has also failed to establish that a transfer of venue based on pre-trial publicity is

appropriate, as the publicity involved here is not "so inherently prejudicial that trial proceedings [in this district] must be presumed to be tainted." *Bakker*, 925 F.2d at 732.[15] Nor is a transfer of venue for purposes of convenience warranted under Rule 21(b), Fed.R.Crim.P. Rather, the appropriate course of action in the circumstances is to continue the proceedings in this district and to conduct a thorough voir dire of all potential jurors to ensure the selection of a fair and impartial jury that is able to set aside any pre-conceived notions regarding this case and render an impartial verdict based solely on the evidence presented in the case and the Court's instructions of law.

## III.

Lindh claims that Count One of the Indictment should be dismissed because, as a Taliban soldier, he was a lawful combatant entitled to the affirmative defense of lawful combatant immunity.[16]

is appropriate are: (i) location of the defendant; (ii) location of possible witnesses; (iii) location of the events at issue; (iv) location of documents and records; (v) disruption of defendant's business; (vi) expense to the parties; (vii) location of counsel; (viii) relative accessibility of place of trial; (ix) docket condition of each district; and (x) any other special elements which might affect the transfer. *See Platt v. Minnesota Mining & Mfg. Co.*, 376 U.S. 240, 243–44, 84 S.Ct. 769, 11 L.Ed.2d 674 (1964).

15. This case is easily distinguishable from *United States v. McVeigh*, 918 F.Supp. 1467 (W.D.Okla.1996), where a transfer of venue was ultimately granted based on the impact of defendant's conduct—the bombing of the Murrah Federal Office Building in Oklahoma City—on the particular district in which the case was filed. This unique and extraordinary local impact led the district judge to conclude that "there is so great a prejudice against these two defendants in the State of Oklahoma that they cannot obtain a fair and impartial trial at any place fixed by law for holding court in that state." *Id.* at 1474. Indeed, in *McVeigh*, the very courthouse

where the case would have been tried had the case not been transferred suffered collateral damage from the bombing. *See id.* at 1469. None of the features that motivated transfer in *McVeigh* is present to the same degree in the instant case.

16. Lindh makes no claim of lawful combatant immunity with respect to the Indictment's allegations that he was a member or soldier of al Qaeda. Instead, Lindh focuses his lawful combatant immunity argument solely on the Indictment's allegations that he was a Taliban member. This focus is understandable as there is no plausible claim of lawful combatant immunity in connection with al Qaeda membership. Thus, it appears that Lindh's goal is to win lawful combatant immunity with respect to the Taliban allegations and then to dispute factually the Indictment's allegations that he was a member of al Qaeda.

Also worth noting is that the government has not argued here that the Taliban's role in providing a home, a headquarters, and support to al Qaeda and its international terrorist activities serve to transform the Taliban from a legitimate state government into a terrorist institution whose soldiers are not entitled to

Lawful combatant immunity, a doctrine rooted in the customary international law of war, forbids prosecution of soldiers for their lawful belligerent acts committed during the course of armed conflicts against legitimate military targets.[17] Belligerent acts committed in armed conflict by enemy members of the armed forces may be punished as crimes under a belligerent's municipal law only to the extent that they violate international humanitarian law or are unrelated to the armed conflict.[18] This doctrine has a long history, which is reflected in part in various early international conventions, statutes and documents.[19] But more pertinent, indeed controlling, here is that the doctrine also finds expression in the Geneva Convention Relative to the Treatment of Prisoners of War, Aug. 12, 1949. 6 U.S.T. 3316, 75 U.N.T.S. 135 ("GPW"), to which the United States is a signatory. Significantly, Article 87 of the GPW admonishes that combatants "may not be sentenced

... to any penalties except those provided for in respect of members of the armed forces of the said Power who have committed the same acts." GPW, art. 87. Similarly, Article 99 provides that "[n]o prisoner of war may be tried or sentenced for an act which is not forbidden by the law of the Detaining Power or by international law, in force at the time the said act was committed." GPW, art. 99. These Articles, when read together, make clear that a belligerent in a war cannot prosecute the soldiers of its foes for the soldiers' lawful acts of war.

The inclusion of the lawful combatant immunity doctrine as a part of the GPW is particularly important here given that the GPW, insofar as it is pertinent here, is a self-executing treaty[20] to which the United States is a signatory. It follows from this that the GPW provisions in issue here are a part of American law and thus binding in federal courts under the Supremacy

---

lawful combatant immunity status. Put another way, the government has not argued that al Qaeda controlled the Taliban for its own purposes and that so-called Taliban soldiers were accordingly merely agents of al Qaeda, not lawful combatants.

**17.** *See, e.g.,* Waldemar A. Solf & Edward R. Cummings, A *Survey of Penal Sanctions Under Protocol I to the Geneva Conventions of August 12, 1949,* 9 Case W.Res.J. Int'l L. 205, 212 (1977).

**18.** *See* James W. Garner, *Punishment of Offenders Against the Laws and Customs of War,* 14 Am.J. Int'l L. 70, 73 (1920); Myres S. McDougal & Florentino P. Feliciano, *Law and Minimum World Public Order: The Legal Regulation of International Coercion* 712 (1961).

**19.** For example, Article 57 of the Lieber Code of 1863, which governed the conduct of war for the Union Army during the American Civil War and which served as the basis for the modern law of war treaties, provided that "[s]o soon as a man is armed by a sovereign government and takes the soldier's oath of fidelity, he is a belligerent; his killing, wounding, or other warlike acts are not individual crimes or offenses." Instructions for the Government of the Armies of the United States in the Field, Headquarters, United States Army, Gen. Order No. 100 (Apr. 24, 1863), *reprinted in The Laws of Armed Conflicts* 3 (3d ed.1988). *See also* Hague Convention Respecting the Laws and Customs of War on Land, Oct. 18, 1907, 36 Stat. 2277, T.S. No. 539; Brussels Declaration of 1874, Article IX, July 27, 1874, *reprinted in The Laws of Armed Conflicts* 25 (3d ed.1988); *Manual of Military Law* 240 (British War Office 1914).

**20.** Treaties are typically classified as self-executing or executory. Executory treaties are addressed to the Congress and require congressional action before becoming effective in domestic courts, whereas a self-executing treaty "is one that operates of itself without the aid of legislation." 74 Am.Jur.2d *Treaties* § 3. The portions of the GPW relevant here neither invite nor require congressional action and hence fall properly into the self-executing category. *See* C. Vasquez, *The Four Doctrines of Self–Executing Treaties,* 89 Am.J. Int'l L. 695 (1995).

Clause.[21] This point, which finds support in the cases,[22] is essentially conceded by the government.[23] Moreover, the government does not dispute that this immunity may, under appropriate circumstances, serve as a defense to criminal prosecution of a lawful combatant.

■■■ Importantly, this lawful combatant immunity is not automatically available to anyone who takes up arms in a conflict. Rather, it is generally accepted that this immunity can be invoked only by members of regular or irregular armed forces who fight on behalf of a state and comply with the requirements for lawful combatants.[24] Thus, it is well-established that

the law of war draws a distinction between the armed forces and the peaceful populations of belligerent nations and also between those who are lawful and unlawful combatants. Lawful combatants are subject to capture and detention as prisoners of war by opposing military forces. Unlawful combatants are likewise subject to capture and detention, but in addition they are subject

to trial and punishment by military tribunals for acts which render their belligerency unlawful.

*Ex Parte Quirin,* 317 U.S. 1, 30–31, 63 S.Ct. 2, 87 L.Ed. 3 (1942) (footnote omitted). The GPW also reflects this distinction between lawful and unlawful combatants, with only the former eligible for immunity from prosecution. *See* GPW, art. 87, 99. Thus, the question presented here is whether Lindh is a lawful combatant entitled to immunity under the GPW.

The starting point in the analysis of Lindh's immunity claim is recognition that the President has unequivocally determined that Lindh, as a member of the Taliban, is an unlawful combatant and, as such, may not invoke lawful combatant immunity. On February 7, 2002, the White House announced the President's decision, as Commander–in–Chief, that the Taliban militia were unlawful combatants pursuant to GPW and general principles of international law, and, therefore, they were not entitled to POW status under the

21. *See* U.S. Const. art. VI, § 2 ("This Constitution, and the laws of the United States which shall be made in pursuance thereof; and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land....").

22. *See United States v. Noriega,* 808 F.Supp. 791, 799 (S.D.Fla.1992) ("[I]t is inconsistent with both the language and spirit of the [GPW] and with our professed support of its purpose to find that the rights established therein cannot be enforced by individual POWs in a court of law.").

23. Also worth noting is that even prior to the ratification of the GPW, some American courts recognized the lawful combatant immunity doctrine. *See Ex Parte Quirin,* 317 U.S. 1, 30–31, 63 S.Ct. 2, 87 L.Ed. 3 (1942); *see also Johnson v. Eisentrager,* 339 U.S. 763, 793, 70 S.Ct. 936, 94 L.Ed. 1255 (1950) (Black, J., dissenting) ("[L]egitimate 'acts of warfare,' however murderous, do not justify criminal conviction.... [I]t is no 'crime' to be a soldier....") (citing *Ex Parte Quirin,* 317

U.S. at 30–31, 63 S.Ct. 2, 87 L.Ed. 3); *United States v. Valentine,* 288 F.Supp. 957, 987 (D.P.R.1968) ("Mere membership in the armed forces could not under any circumstances create criminal liability.... Our domestic law on conspiracy does not extend that far.") (citing *Ford v. Surget,* 97 U.S. 594, 605–06, 24 L.Ed. 1018 (1878)).

24. *See, e.g.,* Howard S. Levie, *Prisoners of War in International Armed Conflict,* 59 Naval War College Int'l L.Stud. 53 n. 192 (1977). Neither presented nor decided here is the question whether lawful combatant immunity is available to one who takes up arms in combat against his own country, as the Indictment alleges Lindh did in this case. At least one commentator suggests that principles of international law permit a nation to prosecute any of its citizens who take up arms against it for treason, even if the citizen does so as part of a lawful armed force. *See* Allan Rosas. *The Legal Status of Prisoners of War* 383 (1976).

Geneva Conventions.[25] This presidential determination, according to the government, is significant, indeed decisive, because the President, as the "Commander in Chief of the Army and Navy of the United States,"[26] has broad constitutional power to issue such a determination. Moreover, in the current conflict, he has also been "authorized" by Congress "to use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons." Authorization for Use of Military Force, Pub.L. No. 107–40, § 2, 115 Stat. 224 (2001). Thus, the government argues, the decision of the President to use force against the Taliban and al Qaeda, as endorsed by Congress, represents the exercise of the full extent of his constitutional presidential authority. It follows, the government contends, that the President's determination that Taliban members are unlawful combatants was made pursuant to his constitutional Commander–in–Chief

and foreign affairs powers and is therefore not subject to judicial review or second guessing because it involves a quintessentially nonjusticiable political question.

This argument, while not without appeal, is ultimately unpersuasive. Because the consequence of accepting a political question argument is so significant—judicial review is completely foreclosed—courts must subject such arguments to searching scrutiny, for it is central to the rule of law in our constitutional system that federal courts must, in appropriate circumstances, review or second guess, and indeed sometimes even trump, the actions of the other governmental branches.[27] At a minimum, this scrutiny requires careful consideration of whether the circumstances that trigger the application of the political question doctrine are present here.[28] Thus, it is difficult to see, except at the highest level of abstraction,[29] a textually demonstrable constitutional commitment regarding this issue. Moreover, it is difficult to see why the application of the GPW's lawful combatant immunity doctrine to Lindh's case involves a lack of

---

**25.** *See* Classified Attachment to Government's Opposition to Motion # 2 (Combat Immunity), *United States v. Lindh*, Criminal No. 02–37–A (E.D.Va. June 5, 2002) (under seal).

**26.** U.S. Const. art. II, § 2, cl. 1.

**27.** In Chief Justice Marshall's famous words, it is "the province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 5 U.S. 1 (Cr.) 137, 177, 2 L.Ed. 60 (1803).

**28.** In *Baker v. Carr*, 369 U.S. 186, 217, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), the Supreme Court described these triggering circumstances in the following terms:

Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for

resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

**29.** At the highest level of abstraction, it may be argued that the Constitution commits the conduct of foreign affairs to the President. This is hardly a clear, demonstrable constitutional commitment to the President to construe and apply treaties free from judicial review. Indeed, as *Baker* warns, "it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance." 369 U.S. at 211, 82 S.Ct. 691.

judicially discoverable and manageable standards. Indeed, the contrary appears to be true. The presence of any remaining factors is also doubtful. To sum up briefly then, while it may be argued that some of the triggering circumstances for a political question are present to some degree here, others plainly are not and thus the government's political question argument is ultimately unpersuasive. Understandably and appropriately, therefore, courts have recognized that treaty interpretation does not implicate the political question doctrine and is not a subject beyond judicial review.[30]

This, however, does not end the analysis, for it remains important to determine the precise nature of judicial review that is appropriate here, including, in particular, what, if any, respect or effect should be afforded the President's determination that Lindh and the Taliban are not lawful combatants entitled to lawful combatant immunity. The answer to this question may be found both in settled caselaw and in sound principle. Thus, courts have long held that treaty interpretations made by the Executive Branch are entitled to some degree of deference.[31] This result also finds support in the principles underlying

the *Chevron* doctrine, which holds that deference to an agency's reasonable interpretation of an ambiguous statute is appropriate where the agency has been charged with administering the statute.[32] The rationale of *Chevron* is that a statutory ambiguity is essentially a delegation of authority by Congress to the responsible agency to resolve the ambiguity. By analogy, treaty interpretation and application warrants similar *Chevron* deference to the President's interpretation of a treaty, as American treaty-makers may be seen as having delegated this function to the President in light of his constitutional responsibility for the conduct of foreign affairs and overseas military operations.[33]

■ It is important to recognize that the deference here is appropriately accorded not only to the President's interpretation of any ambiguity in the treaty, but also to the President's application of the treaty to the facts in issue. Again, this is warranted given the President's special competency in, and constitutional responsibility for, foreign affairs and the conduct of overseas military operations. It is also crucial to be precise regarding the nature of the deference warranted. Conclusive deference, which amounts to judicial ab-

---

**30.** *See, e.g., Japan Whaling Ass'n v. American Cetacean Soc'y,* 478 U.S. 221, 231, 106 S.Ct. 2860, 92 L.Ed.2d 166 (1986) ("As [*Baker v. Carr*] plainly held ... the courts have the authority to construe treaties and executive agreements...."); *More v. Intelcom Support Servs. Inc.,* 960 F.2d 466 (5th Cir.1992) (construing a treaty between United States and Philippines); *United States v. Noriega,* 117 F.3d 1206 (11th Cir.1997) (construing an extradition treaty between United States and Panama).

**31.** *See Kolovrat v. Oregon,* 366 U.S. 187, 194, 81 S.Ct. 922, 6 L.Ed.2d 218 (1961) ("While courts interpret treaties for themselves, the meaning given them by the departments of government particularly charged with their negotiation and enforcement is given great weight."); *Sumitomo Shoji America, Inc. v.*

*Avagliano,* 457 U.S. 176, 194–85, 102 S.Ct. 2374, 72 L.Ed.2d 765 (1982) (same); *United States v. Stuart,* 489 U.S. 353, 367, 109 S.Ct. 1183, 103 L.Ed.2d 388 (1989) (same). *See also* Restatement (Third) of Foreign Relations Law § 112 cmt. c (1987) ("Courts give particular weight to the position taken by the United States Government on questions of international law because it is deemed desirable that so far as possible the United States speak with one voice on such matters.").

**32.** *See Chevron USA, Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

**33.** For a more thorough discussion of this point, see Curtis Bradley, *Chevron Deference & Foreign Affairs,* 86 Va.L.Rev. 649 (2000).

stention, is plainly inappropriate. Rather, the appropriate deference is to accord substantial or great weight to the President's decision regarding the interpretation and application of the GPW to Lindh, provided the interpretation and application of the treaty to Lindh may be said to be reasonable and not contradicted by the terms of the treaty or the facts. It is this proviso that is the focus of the judicial review here of the President's determination that Lindh is an unlawful combatant under the GPW.

The GPW sets forth four criteria an organization must meet for its members to qualify for lawful combatant status:

i. the organization must be commanded by a person responsible for his subordinates;

ii. the organization's members must have a fixed distinctive emblem or uniform recognizable at a distance;

iii. the organization's members must carry arms openly; and

iv. the organization's members must conduct their operations in accordance with the laws and customs of war.

See GPW, art. 4(A)(2). Nor are these four criteria unique to the GPW: they are also established under customary international law [34] and were also included in the Hague Regulations of 1907. See Hague Convention Respecting the Laws and Customs of War on Land, Oct. 18, 1907, 36 Stat. 2277, T.S. No. 539 (Hague Regulations).[35]

 In the application of these criteria to the case at bar, it is Lindh who bears the burden of establishing the affirmative defense that he is entitled to lawful combatant immunity,[36] i.e., that the Taliban satisfies the four criteria required for lawful combatant status outlined by the GPW. On this point, Lindh has not carried his

---

**34.** These criteria were first codified in large part in the Brussels Declaration of 1874, Article IX, July 27, 1874, *reprinted in The Laws of Armed Conflicts* 25 (3d ed.1988). These standards have long been applied by liberal democracies. As explained in the British Manual of Military Law contemporaneous with the Hague Regulations, "[i]t is taken for granted that all members of the army as a matter of course will comply with the four conditions [required for lawful combatant status]; should they, however, fail in this respect . . . they are liable to lose their special privileges of armed forces." *Manual of Military Law* 240 (British War Office 1914).

**35.** Lindh asserts that the Taliban is a "regular armed force," under the GPW, and because he is a member, he need not meet the four conditions of the Hague Regulations because only Article 4(A)(2), which addresses irregular armed forces, explicitly mentions the four criteria. This argument is unpersuasive; it ignores long-established practice under the GPW and, if accepted, leads to an absurd result. First, the four criteria have long been understood under customary international law to be the defining characteristics of any lawful armed force. *See supra* n. 33. Thus,

all armed forces or militias, regular and irregular, must meet the four criteria if their members are to receive combatant immunity. Were this not so, the anomalous result that would follow is that members of an armed force that met none of the criteria could still claim lawful combatant immunity merely on the basis that the organization calls itself a "regular armed force." It would indeed be absurd for members of a so-called "regular armed force" to enjoy lawful combatant immunity even though the force had no established command structure and its members wore no recognizable symbol or insignia, concealed their weapons, and did not abide by the customary laws of war. Simply put, the label "regular armed force" cannot be used to mask unlawful combatant status.

**36.** Defendants bear the burden with respect to affirmative defenses, *i.e.*, defenses that do not merely negate one of the elements of a crime. *See Mullaney v. Wilbur*, 421 U.S. 684, 697–99, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975); *Smart v. Leeke*, 873 F.2d 1558, 1565 (4th Cir.1989).

burden; indeed, he has made no persuasive showing at all on this point. For this reason alone, it follows that the President's decision denying Lindh lawful combatant immunity is correct. In any event, a review of the available record information leads to the same conclusion. Thus, it appears that the Taliban lacked the command structure necessary to fulfill the first criterion, as it is manifest that the Taliban had no internal system of military command or discipline. As one observer noted, "there is no clear military structure with a hierarchy of officers and commanders while unit commanders are constantly being shifted around," and the Taliban's "haphazard style of enlistment ... does not allow for a regular or disciplined army." Kamal Matinuddin, *The Taliban Phenomenon: Afghanistan 1994–97* 59 (1999). Thus, Lindh has not carried his burden to show that the Taliban had the requisite hierarchical military structure.

Similarly, it appears the Taliban typically wore no distinctive sign that could be recognized by opposing combatants; they wore no uniforms or insignia and were effectively indistinguishable from the rest of the population.[37] The requirement of such a sign is critical to ensure that combatants may be distinguished from the non-combatant, civilian population. Accordingly, Lindh cannot establish the second criterion.

Next, although it appears that Lindh and his cohorts carried arms openly in satisfaction of the third criterion for lawful combatant status, it is equally apparent that members of the Taliban failed to observe the laws and customs of war. *See* GPW, art. 4(A)(2). Thus, because record evidence supports the conclusion that the Taliban regularly targeted civilian populations in clear contravention of the laws and customs of war,[38] Lindh cannot meet his burden concerning the fourth criterion.[39]

In sum, the President's determination that Lindh is an unlawful combatant and thus ineligible for immunity is controlling here (i) because that determination is entitled to deference as a reasonable interpretation and application of the GPW to Lindh as a Taliban; (ii) because Lindh has failed to carry his burden of demonstrating the contrary; and (iii) because even absent deference, the Taliban falls far short when measured against the four GPW criteria for determining entitlement to lawful combatant immunity.

## IV.

Lindh argues that Counts Six through Nine of the Indictment should be dismissed because they charge violations of regulations that were promulgated in excess of the statutory authority provided by the parent legislation, the International Economic Emergency Powers Act ("IEE-PA"). 50 U.S.C. § 1701 *et seq.* Specifically, these four counts charge Lindh with "Contributing Services to al Qaeda," "Supplying Services to the Taliban," and con-

---

**37.** *See* Greg Jaffe & Neil King, Jr., *U.S. Says War is Working, but Taliban Remains,* Wall St.J., Oct. 26, 2001, at A3.

**38.** *See* Michael Griffin, *Reaping the Whirlwind: The Taliban Movement in Afghanistan* 177–78 (2001) ("On 9 and 10 September [1997], Taliban troops lined up and shot 100 Shia civilians in the villages of Qazelbad and Qul Mohammad...."); Neamatollah Nojumi, *The Rise of the Taliban in Afghanistan: Mass Mobilization, Civil War, and the Future of the Region* 229 (2002) ("[W]itnesses and international aid workers ... have provided detailed accounts of the mass killings, in which Taliban troops were repeatedly described as rounding up unarmed men and boys from their homes and work sites and shooting them in the head.").

**39.** What matters for determination of lawful combatant status is not whether Lindh personally violated the laws and customs of war, but whether the Taliban did so. *See* GPW, art. 4.

spiracy to do each of these, all in violation of, respectively, 31 C.F.R. §§ 545.204, 545.206, 595.204, 595.205 (collectively, the "Regulations"). Simply put, Lindh contends that IEEPA does not authorize the promulgation of the Regulations to proscribe the conduct alleged in the Indictment. More particularly, Lindh argues that IEEPA cannot be construed to authorize promulgation of any regulations prohibiting his voluntary and noncommercial donation of services to the Taliban and al Qaeda.

The IEEPA is a relatively recent addition to this country's arsenal of sanctions to be used against hostile states and organizations in times of national emergency. For much of the twentieth century, this county's sanctions programs were governed by the Trading with the Enemy Act (hereafter "TWEA"), enacted in 1917.[40] As amended in 1933, TWEA granted the President broad authority "to investigate, regulate, ... prevent or prohibit ... transactions" in times of war or declared national emergencies. *See* 50 U.S.C. app. § 5(b); *see also Dames & Moore v. Regan,* 453 U.S. 654, 672, 101 S.Ct. 2972, 69 L.Ed.2d 918 (1981). Congress changed this statutory scheme in 1977 to limit TWEA's application to periods of declared wars, but created IEEPA to provide the President similar authority for use during other times of national emergency. *See* Senate Rep. No. 95–466 at 2, *reprinted in* 1977 U.S.C.C.A.N. 4540, 4541; *see also Regan v. Wald,* 468 U.S. 222, 227–28, 104 S.Ct. 3026, 82 L.Ed.2d 171 (1984); *United States v. Arch Trading Co.,* 987 F.2d 1087, 1093 (4th Cir.1993) ("IEEPA ... was drawn from and constitutes an extension of the [TWEA]."). Specifically, the language of IEEPA vests the President with the power to prescribe regulations to

regulate, direct and compel, nullify, void, prevent or prohibit any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest by any person....

50 U.S.C. § 1792(a)(1)(B). This power includes the authority to prescribe "definitions, as may be necessary for the exercise of the authorities granted by this chapter." 50 U.S.C. § 1704.

In January 1995, President Clinton, exercising his IEEPA authority, issued Executive Order 12947, declaring a national emergency to deal with the extraordinary threat posed by foreign terrorists who disrupt the Middle East peace process. *See* 60 Fed.Reg. 5079 (1995). In Section 1 of that Order, the President prohibited "any transaction or dealing by United States persons ... in property or interests in property of the persons designated in or pursuant to this order ..., including the making or receiving of any contribution of funds, goods, or services to or for the benefit of such persons." 60 Fed.Reg. 5079. And Section 4 of the Order empowered the Secretary of the Treasury "to take such actions, including the promulgation of rules and regulations, and to employ all powers granted to [the President] by IEEPA as may be necessary to carry out the purposes" of the Order. 60 Fed.Reg. 5080.[41] Thereafter, the Treasury Department, via the Office of Foreign Assets Control ("OFAC"), promulgated, *inter alia,* 31 C.F.R. § 595.204, which, in relevant part, repeated the mandate of Executive Order 12947 regarding the prohibition

---

**40.** *See* 50 U.S.C. app. §§ 1–44.

**41.** Under 50 U.S.C. § 1704, the President is authorized to delegate his power under Section 1702.

on "the making or receiving of any contribution of funds, goods, or services" to or for the benefit of terrorists designated in, or pursuant to, the Executive Order. 31 C.F.R. § 595.204. OFAC also promulgated a regulation prohibiting conspiracy to commit such an act. *See* 31 C.F.R. § 595.205. Then, in August 1998, President Clinton added al Qaeda to the list of terrorists subject to sanctions under the Order. *See* Executive Order 13099, 63 Fed.Reg. 45167 (1998).[42]

In July 1999, again drawing upon his IEEPA authority, President Clinton issued Executive Order 13129, declaring a national emergency to deal with the threat posed by the Taliban. Specifically, the President found that the actions of the Taliban in Afghanistan in allowing territory there to be used as a safehaven and base of operations for Usama bin Laden and al Qaeda constituted an unusual and extraordinary threat to the national security and Foreign policy of the United States. *See* 64 Fed.Reg. 36759 (1999). Presidents Clinton and Bush subsequently determined, in June 2000 and in June 2001, that the national emergency with respect to the Taliban would continue. *See* 65 Fed.Reg. 41549 (2000); 66 Fed. Reg. 35363 (2001). In Section 2 of Executive Order 13129. President Clinton prohibited "any transaction or dealing by United States persons . . . in property or interests in property blocked pursuant to this order, . . . including the making or receiving of any contribution of funds, goods, or services to or for the benefit of the Taliban." 64 Fed.Reg. 36759. In Section 5 of the Order, he empowered the Secretary of the Treasury "to take such

actions, including the promulgation of rules and regulations, and to employ all powers granted to [the President] by IEEPA as may be necessary to carry out the purposes" of the Order. Responding to this direction, the Secretary of the Treasury, again through OFAC, promulgated the Taliban sanctions regulations, which repeat, in relevant part, Executive Order 13129, and prohibit "the making or receiving of any contribution of funds, goods, or services to or for the benefit of the Taliban,"[43] bar the supply of "services" by a U.S. person to the Taliban,[44] and explain that the ban on "services" to the Taliban applies to services "performed on behalf of the Taliban."[45]

Despite the breadth of the Regulations and Executive Orders issued pursuant to IEEPA. Lindh asserts that IEEPA does nothing more than permit the President to freeze the assets of a foreign state or foreign national and prohibit certain international financial transactions during times of a declared national emergency. Lindh argues, moreover, that neither the plain meaning of IEEPA, nor its legislative history, indicate that it provides a basis for the wide-ranging regulations here in issue. Thus, Lindh argues, the Regulations he is charged with violating, namely, 31 C.F.R. §§ 545.204, 545.206, 595.204, 595.205, exceed IEEPA's statutory grant of power.

 The straightforward question presented, therefore, is whether the Regulations are within the scope of IEEPA. As this is a question of statutory construction, analysis must begin "as always with the language of the statute."[46] And, "when a statute is plain on its face, a courts inquiry

---

**42.** Both President Clinton and President George W. Bush have annually continued the state of emergency proclaimed in Executive Order 12947. *See* 67 Fed.Reg. 3033 (2002); 66 Fed.Reg. 7371 (2001).

**43.** 31 C.F.R. § 545.201(b).

**44.** *Id.* § 545.204; *see also id.* § 545.206 (conspiracy).

**45.** *Id.* § 545.406.

**46.** *Duncan v. Walker,* 533 U.S. 167, 172, 121 S.Ct. 2120, 150 L.Ed.2d 251 (2001); *see also*

is at an end." [47] Only when a statute's plain meaning is ambiguous is it appropriate to consider its structure and purpose to resolve an ambiguity and determine the statute's meaning. *See United States v. Clifford*, 197 F.Supp.2d 516, 519 (E.D.Va. 2002).

The IEEPA language in issue is as follows:

the President may, under such regulations as he may prescribe, by means of instructions, licenses, or otherwise—

(A) investigate, regulate, or prohibit—

(i) any transactions in foreign exchange,

(ii) transfers of credit or payments between, by, through or to any banking institution, to the extent that such transfers or payments involve any interest of any foreign country or a national thereof,

(iii) the importing or exporting of currency or securities; and

(B) investigate, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest;

by any person, or with respect to any property, subject to the jurisdiction of the United States.

50 U.S.C. § 1702. This language manifestly sweeps broadly, as courts have consistently recognized in according deference to various sanctions programs under IEEPA and TWEA.[48] On the question presented—whether the statute authorizes issuance of the Regulations—the statute's plain language is dispositive. Specifically, the dispositive language authorizes regulation and prohibition of the "use ..., or dealing in, or exercising any right, power, or privilege with respect to, ... any property" in which any "foreign country or national" has an interest. This sweeping language provides ample authority for the issuance of the Regulations and also easily reaches Lindh's alleged conduct. This conduct—which includes, for example, attending Taliban and al Qaeda training camps, using and transporting Taliban and

*Adams v. Dole*, 927 F.2d 771, 774 (4th Cir. 1991) ("As is appropriate in every case which turns on statutory construction, we begin with the language of the statute."); *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 122 S.Ct. 941, 950, 151 L.Ed.2d 908 (2002) (holding that statutory interpretation begins "with the language of the statute").

**47.** *Rosmer v. Pfizer, Inc.*, 263 F.3d 110, 117 (4th Cir.2001).

**48.** *See Dames & Moore*, 453 U.S. at 672, 101 S.Ct. 2972 (noting the "broad authority of the Executive when acting under this congressional grant of power"); *Paradissiotis v. Rubin*, 171 F.3d 983, 987–88 (5th Cir.1999) (holding that IEEPA grants the President sweeping powers); *Regan*, 468 U.S. at 228, 232 n. 16, 244, 104 S.Ct. 3026 (recognizing the similarity in authorities under TWEA and

IEEPA and their "sweeping statutory language," and confirming the deference due the Executive Branch's implementation of TWEA-based sanctions programs); *Chas. T. Main Int'l, Inc. v. Khuzestan Water & Power Auth.*, 651 F.2d 800, 807 (1st Cir.1981) (noting that "[t]he language of IEEPA is sweeping and unqualified"); *United States v. McKeeve*, 131 F.3d 1, 10 (1st Cir.1997) ("IEEPA codifies Congress's intent to confer broad and flexible power upon the President to impose and enforce economic sanctions against nations that the President deems a threat to national security interests."). *See also United States v. Curtiss–Wright Export Corp.*, 299 U.S. 304, 320, 57 S.Ct. 216, 81 L.Ed. 255 (1936) (noting that generally the President's actions are entitled to greater deference when acting in the fields of foreign affairs or national security); *Miranda v. Secretary of the Treasury*, 766 F.2d 1, 3 (1st Cir.1985) (same).

al Qaeda weapons and ammunition, and using Taliban and al Qaeda transportation and residence facilities—plainly involves "use" of Taliban and al Qaeda "property." And, given the breadth of the common dictionary meanings of "use," "dealing," "transactions" and "property,"[49] there is similarly no doubt that Lindh's provision of combatant services to the Taliban and al Qaeda also falls within the IEEPA and the Regulations.[50]

Although IEEPA's plain language is clearly broad enough to authorize the Regulations, the same result would obtain even were the IEEPA deemed ambiguous. In that event, under settled *Chevron* principles,[51] the President's and the Treasury Secretary's determinations as to the proper scope and construction of the IEEPA are entitled to deference unless, as is not true here, those determinations are unreasonable or contrary to the statutory language. The D.C. Circuit put this point well in connection with upholding the validity of related OFAC regulations:

> By section 1704 of the Emergency Powers Act the President may "issue such regulations, including regulations prescribing definitions, as may be necessary for the exercise of the authorities granted by this chapter." ... The President delegated his power to define the statutory terms to the Secretary of the Treasury, and OFAC exercises the delegated power on the Secretary's behalf. By these provisions OFAC has received the authority to administer the statute, so that we must give effect to OFAC's regulations unless they contradict express statutory language or prove unreasonable.

*Consarc Corp. v. Iraqi Ministry*, 27 F.3d 695, 701 (D.C.Cir.1994) (citations omitted).[52] Similarly, the OFAC regulations

**49.** *See United States v. Maxwell*, 285 F.3d 336, 341 (4th Cir.2002) (holding that where a particular term is undefined within a statute, "we turn to its dictionary definition for its common meaning"); *see also United States v. Ehsan*, 163 F.3d 855, 858 (4th Cir.1998) (same).

**50.** In the course of oral argument, counsel were asked hypothetically whether IEEPA and the related Regulations would prohibit a nuclear physicist's donation of her expertise to the Taliban or al Qaeda in connection with the development of a nuclear bomb. Defense counsel's negative answer is contradicted by the sweeping breadth of IEEPA's language. The physicist's donation would plainly amount to dealing in, or a transaction with respect to, the "property" of those organizations, namely the organizations' bomb or their plans or information to build such a bomb. It is unnecessary to reach here whether IEEPA would authorize regulations prohibiting provision of every conceivable (even implausible) service, say the delivery to the Taliban or al Qaeda of *Commentary* or the *National Review*.

**51.** In *Chevron*, 467 U.S. at 843, 104 S.Ct. 2778, it was held that courts will defer to an agency's interpretation of an ambiguous statute if the agency has been charged with administering the statute and the agency's interpretation is based on a permissible reading of the statute.

**52.** *See also Consarc Corp. v. OFAC*, 71 F.3d 909, 914 (D.C.Cir.1995) (holding that "a challenge to [OFAC's] interpretation [of its regulations] must either demonstrate that the statute [IEEPA] clearly forbids the agency's interpretation or that the interpretation is unreasonable"); *Propper v. Clark*, 337 U.S. 472, 481, 69 S.Ct. 1333, 93 L.Ed. 1480 (1949) (noting that, because TWEA and a previous emergency act delegated to the President the "power of definition," such delegation "permit[ted] him to bring atypical forms of financial institutions within reach of the emergency act"). In *Consarc Corp.*, the court also held that

> [w]e think that OFAC may choose and apply its own definition of property interests, subject to deferential judicial review.... We thus have warrant only to inquire whether OFAC's construction of the regulatory terms ... "present, future or contingent [interest]" so far departed from common usage as to be plainly wrong.

27 F.3d at 701–02. *See also United States v. Quong*, 303 F.2d 499, 503 (6th Cir.1962) ("The term 'any interest' [in TWEA] must be

here in issue must be given effect as they neither contradict the IEEPA, nor are they unreasonable.

Lindh's conduct falls within the ambit of the IEEPA for yet another reason. The IEEPA contains only two express exceptions, neither of which covers Lindh's conduct.[53] This feature of IEEPA calls into play the settled principle that "[w]here Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent." *TRW v. Andrews,* 534 U.S. 19, 122 S.Ct. 441, 447, 151 L.Ed.2d 339 (2001). This principle operates to defeat Lindh's efforts to limit the IEEPA's reach by implying an exclusion for the donation of services in a noncommercial setting to foreign terrorist organizations. Such services are clearly within the broad sweep of the statute's plain language.

Lindh seeks to avoid the result reached here by arguing that IEEPA concerns only commercial or economic conduct. In support, he cites the statute's title and the fact that many cases involving IEEPA and TWEA address solely economic or commercial activity.[54] This argument, while not implausible, is again contradicted by the statute's sweeping broad language. As noted, the plain dictionary meanings of statutory terms like "transaction," "dealing," "use," and "property" do not limit their use to commercial transactions; these terms are sufficiently broad to cover the conduct alleged here, including the donations of combatant services.

Lindh also argues unpersuasively that the D.C. Circuit's decision in *American Airways Charters, Inc. v. Regan,* 746 F.2d 865, 871–74 (D.C.Cir.1984) precludes the result reached here. There, the court held that under the TWEA the Executive Branch could require a license before execution of a transaction reaching assets of a designated Cuban national, but that it lacked the authority to condition the bare formation of an attorney-client relationship on advance governmental approval. This decision is easily distinguishable from the instant case; it is rooted in constitutional due process concerns arising from the formation of the attorney-client relationship and the ability of a person to choose his or her counsel; it does not address the IEEPA's scope or the question whether that scope is ample authorization for the Regulations in issue.

Equally unpersuasive is Lindh's claim that because the statutory authority of IEEPA is at best ambiguous, the rule of lenity calls for dismissal. Where, as here, "[t]he fact that a statute can be applied in situations not expressly anticipated by Congress does not demonstrate ambiguity." *See PGA Tour, Inc. v. Martin,* 532 U.S. 661, 689, 121 S.Ct. 1879, 149 L.Ed.2d 904 (2001). Rather, such wide applicability

---

defined in the broadest sense and includes any interest whatsoever, direct or direct."); *Dames & Moore v. Regan,* 453 U.S. 654, 668–69, 101 S.Ct. 2972, 69 L.Ed.2d 918 (1981) (recognizing that executive actions taken pursuant to congressional authorization receive "the strongest of presumptions and the widest latitude of judicial interpretation") (internal quotation marks omitted).

**53.** IEEPA provides that "[t]he authority granted to the President" does not include the authority to regulate or prohibit, directly or indirectly: (i) "any postal, telegraphic, tele-

phonic, or other personal communication, which does not involve a transfer of anything of value" or (ii) "donations" of "articles, such as food and clothing, and medicine, intended to be used to relieve human suffering." 50 U.S.C. § 1702(b)(1)–(2).

**54.** *See Dames & Moore,* 453 U.S. 654, 101 S.Ct. 2972, 69 L.Ed.2d 918 (nullification of attachment and liens); *Paradissiotis,* 171 F.3d 983 (freezing securities assets); *Iraqi Ministry,* 27 F.3d 695 (regarding a letter of credit); *Chas. T. Main Int'l, Inc.,* 651 F.2d 800 (failure to pay for services).

demonstrates breadth. *See id.* Indeed, IEEPA is simply not an ambiguous statute, and, accordingly, the rule of lenity is inapplicable here. *See Clifford,* 197 F.Supp.2d at 522.[55]

In summary, because the IEEPA's expansive plain language furnishes ample authority for the promulgation of the Regulations, this motion to dismiss must be denied.

### V.

Lindh next argues that Counts Eight and Nine of the Indictment, which charge Lindh with providing and conspiring to provide prohibited services to the Taliban, should be dismissed because he is the victim of impermissible selective prosecution, in violation of his right to equal protection under the Fifth Amendment.[56] Specifically, Lindh argues (i) he is the first to be prosecuted or criminally investigated under 31 C.F.R. §§ 545.204, 545.206(a), 545.206(b), despite the fact that others appear to have violated these Regulations; and (ii) his selection for prosecution under the Regulations is based on his exercise of First Amendment rights. Should dismissal not be apparent on the existing record, Lindh seeks an evidentiary hearing to demonstrate the validity of his claim.

In directing that the Executive Branch "take Care that the Laws be faithfully executed,"[57] the Constitution clearly confers broad prosecutorial discretion on that Branch. As a result of this constitutional delegation of authority, a "presumption of regularity" attaches to the Executive Branch's prosecutorial decisions, and "in the absence of clear evidence to the contrary, courts presume that [the President, Attorney General, and the United States Attorneys] have properly discharged their official duties." *United States v. Armstrong,* 517 U.S. 456, 464, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996) (quoting *United States v. Chemical Found., Inc.,* 272 U.S. 1, 14–15, 47 S.Ct. 1, 71 L.Ed. 131 (1926)). Ordinarily, the decision whether to prosecute, whether to bring particular charges, or whether to bring a case before a grand jury rests entirely in the discretion of the Executive Branch. *See Bordenkircher v. Hayes,* 434 U.S. 357,

---

**55.** Not decided here is the question whether in the case of an ambiguous statute construed by the responsible executive agency, the *Chevron* doctrine precludes the operation of the rule of lenity. It is true that some judicial doctrines may trump *Chevron* deference, but it is not clear from existing authority whether the rule of lenity is such a doctrine. *See* Bradley, *supra* n. 33 at 721–22 (noting that dormant foreign affairs preemption trumps *Chevron*-like executive deference). In the instant case, however, it seems clear that even assuming the IEEPA is ambiguous, the rule of lenity does not apply. This follows from the fact that any ambiguity in the IEEPA's scope was resolved by the President in Executive Orders and the Treasury Secretary in the Regulations, long before Lindh's decision to engage in the alleged conduct. Lindh, therefore, had ample notice of the resolution of the ambiguity and therefore notice of the scope of the prohibition. Thus, fair notice, the justification for the rule of lenity, has no applica-

tion here. *See Babbitt v. Sweet Home Chapter of Communities for a Great Oregon,* 515 U.S. 687, 704 n. 18, 115 S.Ct. 2407, 132 L.Ed.2d 597 (1995) ("The rule of lenity is premised on two ideas: first, a fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed; second, legislatures and not courts should define criminal activity.") (citations and internal quotation marks omitted); *see also United States v. Seidman,* 156 F.3d 542, 559 (4th Cir.1998) (same).

**56.** *See Bolling v. Sharpe,* 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954) (holding that the Fifth Amendment's due process clause contains an implicit right to equal protection).

**57.** U.S. Const. art. II, § 3; *see also United States v. Armstrong,* 517 U.S. 456, 464, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996) (citations omitted).

364, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978); *see also Wayte v. United States,* 470 U.S. 598, 607, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985) (holding that prosecutive decisions are "particularly ill-suited to judicial review" because an evaluation of prosecutive factors is not "susceptible to the kind of analysis courts are competent to undertake"). Yet, this discretion is neither limitless nor wholly immune from judicial scrutiny; claims of selective prosecution must be judicially examined and prosecutorial decisions found by courts to be infected by impermissible discriminatory purposes and effects that violate equal protection are subject to dismissal. *See Armstrong,* 517 U.S. at 465, 116 S.Ct. 1480.

■ Significantly, claims of selective prosecution are not easily established. Such a claim "is not a defense on the merits to the criminal charge itself, but an independent assertion that the prosecutor has brought the charge for reasons forbidden by the Constitution." *Id.* at 463, 116 S.Ct. 1480. To prevail on a selective prosecution claim based upon equal protection, Lindh bears the heavy burden of showing both that the government's prosecution policy had a discriminatory effect and that it was motivated by a discriminatory purpose.[58] In other words, to overcome the presumption of regularity that attaches to prosecutorial decisions and to establish a *prima facie* case of impermissible selective prosecution, a defendant must show "clear evidence" of both "discriminatory effect" and "discriminatory, purpose." *Id.* at 465, 116 S.Ct. 1480. This standard is intended to be both "demanding" and "rigorous." *United States v. Olvis,* 97 F.3d 739, 743 (4th Cir.1996) (internal quotation marks and citations omitted).

■ Even to obtain discovery—relief Lindh seeks here in the alternative—a defendant must meet a "correspondingly rigorous standard," namely, showing "some evidence" of "the existence of the essential elements of the defense." *Armstrong,* 517 U.S. at 468, 116 S.Ct. 1480 (quoting *United States v. Berrios,* 501 F.2d 1207, 1211 (2d Cir.1974)). This evidentiary threshold is "intended to be 'a significant barrier to the litigation of insubstantial claims,' "[59] because "discovery 'imposes many of the costs presented when the Government must respond to a *prima facie* case of selective prosecution.' "[60] In this case, Lindh has neither demonstrated the essential elements of a selective prosecution claim, nor met the rigorous evidentiary standard for obtaining discovery on such a claim.

To surmount the first hurdle in the selective prosecution analysis, Lindh must establish a discriminatory effect by showing that similarly situated individuals outside of the protected group were not prosecuted. *See Armstrong,* 517 U.S. at 465, 116 S.Ct. 1480; *United States v. Hastings,* 126 F.3d 310, 315 (4th Cir.1997). Such a showing is an "absolute requirement." *Armstrong,* 517 U.S. at 467, 116 S.Ct. 1480. In this respect, Lindh claims he is in a protected class of persons that has exercised its First Amendment rights by associating with the Taliban for religious

---

58. *See Armstrong,* 517 U.S. at 465, 116 S.Ct. 1480; *Wayte,* 470 U.S. at 608, 105 S.Ct. 1524; *United States v. Olvis,* 97 F.3d 739, 746 (4th Cir.1996) (holding that "defendants bear the burden of establishing all elements of their selective-prosecution claim and, to obtain discovery on such a claim, the burden of making a credible showing of 'some evidence' on each element").

59. *United States v. Hastings,* 126 F.3d 310, 314 (4th Cir.1997) (quoting *Armstrong,* 517 U.S. at 463–64, 116 S.Ct. 1480).

60. *Olvis,* 97 F.3d at 743 (quoting *Armstrong,* 517 U.S. at 468, 116 S.Ct. 1480).

reasons.[61] He therefore claims he is the victim of selective prosecution because the government has chosen not to prosecute others who provided services to the Taliban for non-religious reasons, but to prosecute him for providing services for religious reasons. Specifically, Lindh seeks to compare his prosecution to the non-prosecution of the following five entities: Telephone Systems International (TSI), Unocal, the University of Nebraska at Omaha (UNO), Laili Helms, and Abdul Hakim Mojahid.[62]

■■■ Lindh's argument fails on two grounds. First, Lindh fails to show that the two individuals, Helms and Mojahid, associated with the Taliban for non-religious reasons. Accordingly, on this record, Lindh has not shown that they are outside his protected class. Second, it is apparent that none of the entities Lindh identifies are similarly situated to him. As the Fourth Circuit has noted, "defendants are similarly situated when their circumstances present no distinguishable legitimate prosecutorial factors that might justify making different prosecutorial decisions with respect to them." *Olvis,* 97 F.3d at 744. In *Olvis,* the Fourth Circuit rejected the selective prosecution claims of two African–American defendants charged with conspiring to distribute crack cocaine who alleged they were similarly situated to white co-conspirators who had been granted immunity or not been prosecuted. *See*

*id.* The Fourth Circuit held that the district court erred by considering only the relative culpability of the conspirators and failing to "take into account several factors that play important and legitimate roles in prosecutorial decisions," namely

i. offers of immunity to a defendant;

ii. strength of evidence against a defendant;

iii. a defendant's role in the crime;

iv. whether a defendant is being prosecuted by another jurisdiction;

v. a defendant's candor and willingness to plead guilty;

vi. the amount of resources required to convict a defendant;

vii. the extent of prosecutorial resources;

viii. the potential impact of a prosecution on related investigations and prosecutions; and

ix. prosecutorial priorities for addressing specific types of illegal conduct.

*See id.* Thus, the government is clearly entitled to establish "prosecutorial priorities for addressing specific types of illegal conduct" and to make prosecutorial decisions based on those priorities. *Olvis,* 97 F.3d at 744. Based on legitimate prosecutorial factors, Lindh's circumstances are plainly distinguishable from the purported circumstances of TSI, Unocal, UNO, Helms, and Mojahid. Indeed, the nature

---

**61.** *See United States v. Crowthers,* 456 F.2d 1074, 1079 (4th Cir.1972) ("For officials of the United States government to selectively and discriminatorily enforce [a regulation] so as to turn it into a scheme whereby activities protected by the First Amendment are allowed or prohibited in the uncontrolled discretion of these officials violates the defendants' right to equal protection of the laws embraced within the due process clause of the Fifth Amendment.").

**62.** Lindh presents the following evidence with respect to each of these entities' contacts with

the Taliban: (i) TSI worked pursuant to a contract it had won with the Taliban government to build a wireless telephone system in Afghanistan; (ii) Unocal·worked on a project with the Taliban to build a natural gas pipeline from Turkmenistan through Afghanistan to Pakistan; (iii) UNO received money from Unocal to fund visits by several Taliban members to the United States; (iv) Helms, a Unocal employee, coordinated communication between the Taliban and, *inter alia,* the United States Department of State; and (v) Mojahid was a spokesperson and diplomat for the Taliban.

of the combatant services Lindh provided to the Taliban is, by itself, a distinction sufficient to justify his prosecution over TSI, Unocal, UNO, Helms, and Mojahid: none of these entities swore allegiance to jihad, trained at an al Qaeda or Taliban camp, or traveled to the front lines and there engaged in combat on behalf of al Qaeda or the Taliban. Simply put, the five entities cited by Lindh are not similarly situated to him.

Lindh's selective prosecution claim fails not simply because he is unable to show a discriminatory effect, but also because he cannot show a discriminatory purpose. To establish that this prosecution was motivated by a discriminatory purpose, Lindh must show "that the decision to prosecute was 'invidious or in bad faith.'" *Olvis*, 97 F.3d at 743 (quoting *Berrios*, 501 F.2d at 1211). Lindh relies on three factors to support his claim of discriminatory purpose: (i) the allegations in the Complaint; (ii) the IEEPA's legislative history; and (iii) "the high-level decisionmaking that led to [the defendant's] prosecution." None of these factors demonstrate the requisite discriminatory purpose.

 To be sure, the allegations in the Complaint and the Indictment chronicle Lindh's conversion to Islam, his religious studies in Yemen and Pakistan, his voluntary association with the Taliban, and his oath of allegiance to jihad. Yet, none of this proves, as Lindh suggests, that the government prosecuted him because of his religious association. Instead, these allegations do nothing more than provide a chronology and context to explain how Lindh came to be on the battle front in Afghanistan and to supply services and support to the Taliban and al Qaeda. Dis-

criminatory purpose cannot be inferred from a recitation of historical facts that merely provide context for criminal charges.[63] Here, nothing in the Complaint or the Indictment suggests that Lindh's religious reasons for providing services to the Taliban motivated the government's decision to charge him with the offenses set out in Counts Eight and Nine. To the contrary, the serious offenses with which he is charged, *i.e.*, conspiracy to murder U.S. nationals and aiding foreign terrorist states and organizations, are manifestly the reasons for his prosecution, not his religious affiliation. Given the gravity of the allegations, there is every reason to believe that Lindh would have been prosecuted even had he been, say, a Presbyterian, a Scientologist, or an atheist.

Lindh argues that legislative history reflects that the IEEPA and the Regulations promulgated thereunder were intended to prohibit solely commercial or economic conduct. From this, Lindh argues that the extension of the IEEPA and the Regulations to cover his conduct can only be explained by his selective prosecution claim. As noted elsewhere, however, the IEEPA and its Regulations are not limited to commercial transactions, as Lindh argues, but are more than ample in scope to cover the conduct alleged in the Indictment.[64] There is, in short, no basis in the IEEPA's legislative history to support an inference that his prosecution was undertaken for a discriminatory purpose.

Lindh also argues that because the President, the Attorney General, and other high-level officials were involved in the decision to prosecute him, his prosecution was somehow selective. Yet, simply because these decisions were allegedly made

---

**63.** *See United States v. Hastings,* 126 F.3d 310, 314 (4th Cir.1997) (holding that the mention in an Internal Revenue Service memoranda of a prosecuted individual's political affiliation, without any hint that the affiliation was the reason for prosecution, cannot be the basis for a selective prosecution claim).

**64.** *See supra* Part IV.

by high-level officials does not mean that these persons had a discriminatory purpose or intent. The inference Lindh advocates—that the involvement of high-level officials in the prosecution decision means that the decision was infected with discriminatory animus—is a complete *non sequitur*. There is no reason to believe that discriminatory purpose follows from the involvement of high-level officials. Indeed, given the unique and novel nature of this case, it would have been surprising had the highest-level officials not been involved in the decision to prosecute.[65]

■ In sum, Lindh has failed to offer any evidence of either of the requirements for a selective prosecution claim: discriminatory effect and discriminatory purpose.[66]

65. Lindh's argument that the mere involvement of high-ranking executive branch officers proves discriminatory intent is not supported by the lone case he cites. The case, *United States v. Falk*, 479 F.2d 616 (7th Cir. 1973) (*en banc*), involved a prosecution for failure to possess a draft card. There, the Seventh Circuit vacated a defendant's conviction because, *inter alia*, the defendant had offered proof that the government had focused on vocal dissenters against the selective service system. *See id.* at 621. This proof included a statement by an Assistant United States Attorney indicating that Falk's prosecution had been approved by several officials in the United States Attorney's office, the United States Attorney, and the Department of Justice. The court stated that "[i]t is difficult to believe that the usual course of proceedings in a draft case requires such careful consideration by such a distinguished succession of officials prior to a formal decision to prosecute." *Id.* at 622. This case is quite clearly not comparable to an ordinary draft case. Lindh is charged not with being merely a "vocal dissenter," but with being an American citizen who joined and supported international terrorist organizations hostile to this country and ultimately took up arms against his own country in a conspiracy to kill Americans. Thus, the *Falk* case is clearly distinguishable.

66. Lindh has also failed to show that he should be granted discovery on the matter.

And, "in the absence of clear evidence to the contrary, courts presume that [prosecutors] have properly discharged their duties." *Armstrong*, 517 U.S. at 464, 116 S.Ct. 1480 (quoting *Chemical Found.*, 272 U.S. at 14–15, 47 S.Ct. 1).

## VI.

Lindh also seeks dismissal of Counts Two through Nine of the Indictment on freedom of association, overbreadth, and vagueness grounds. Counts Two through Five charge Lindh with conspiracy to provide and providing material support and resources to foreign terrorist organizations, namely HUM (Counts Two and Three) and al Qaeda (Counts Four and Five), in violation of 18 U.S.C. § 2339B.[67]

In *United States v. Wilson*, 262 F.3d 305, 321 (4th Cir.2001), the Fourth Circuit reversed a district court's decision to order discovery into a prison escapee's claim of vindictive prosecution and reinstated the indictment that had been dismissed when the government refused to provide discovery. The court held that "even before a court allows a defendant to have discovery on the government's prosecutorial decisions, the defendant must overcome a significant barrier by advancing objective evidence tending to show the existence of prosecutorial misconduct." *Id.* at 315. Under the circumstances of this case, Lindh has failed to offer even "some evidence" of discriminatory intent that could overcome the presumption of regularity and permit discovery into the government's decisionmaking process.

67. Section 2339B provides that any person within the United States or subject to its jurisdiction who "knowingly provides material support or resources to a foreign terrorist organization, or attempts or conspires to do so" commits a felony. A "terrorist organization" means an organization designated as such under 8 U.S.C. § 1189. *See* 18 U.S.C. § 2339B(g)(6). Both al Qaeda and HUM have been designated as foreign terrorist organizations by the Secretary of State. *See supra* Part I n. 2 and n. 4. The phrase "material support or resources" is defined as including

Counts Six and Seven charge conspiracy to contribute and contributing services to al Qaeda, in violation of 50 U.S.C. § 1705(b) [68] and 31 C.F.R. pt. 595.[69] And, Counts Eight and Nine charge conspiracy to supply and supplying services to the Taliban, in violation of 50 U.S.C. § 1705(b) and 31 C.F.R. pt. 545.[70] Each count of the Indictment also alleges that Lindh committed specific overt acts. Those acts include that Lindh crossed from Pakistan into Afghanistan for the purpose of taking up arms with the Taliban; that he reported to a Taliban recruiting center in Kabul; that he attended al Qaeda's al-Farooq training camp for military training and participated in a terrorist training course; that after completing his training he was issued rifles and grenades; that he traveled with other combatants to the front line in Takhar, in northeastern Afghanistan, where he opposed Northern Alliance forces; that he remained with his fighting group after the entry of the United States into the conflict and until he surrendered at Konduz; and that he was among a group of Taliban prisoners who staged a violent uprising at the QIJ prison that resulted in the death of an American intelligence agent.

Lindh's First Amendment argument, distilled to its essence, is that he has a constitutional right to associate with foreign individuals and groups and that Counts Two through Nine impermissibly infringe this right by criminalizing this association. The statutes and regulations on which the Counts rest amount, in his view, to the government's attempt to impose on him guilt by association.

This argument is specious. Lindh is not accused of merely associating with a disfavored or subversive group whose activities are limited to circulating inflammatory political or religious material exhorting opposition to the government. Far from this, Lindh is accused of joining groups that do not merely advocate terror, violence, and murder of innocents; these groups actually carry out what they advocate and those who join them, at whatever level, participate in the groups' acts of terror, violence, and murder. There is, in other words, a clear line between First Amendment protected activity and criminal conduct for which there is no constitutional protection. Justice Douglas understood this clear distinction; he put this point well in *Dennis v. United States*, 341 U.S. 494, 581, 71 S.Ct. 857, 95 L.Ed. 1137 (1951), where, dissenting from a conviction of members of the Communist Party of the United States, he noted that

> [i]f this were a case where those who claimed protection under the First Amendment were teaching the techniques of sabotage, the assassination of the President, the filching of documents from public files, the planting of bombs, the art of street warfare, and the like, I would have no doubts. The freedom to speak is not absolute; the teaching of methods of terror and other seditious conduct should be beyond the pale along with obscenity and immorality.

currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel, transportation, and other physical assets, except medicine or religious materials.

18 U.S.C. § 2339A(b).

**68.** Section 1705(b) of Title 50, part of IEEPA, provides that whoever "willfully violates, or willfully attempts to violate, any license, order, or regulation issued under this chapter" commits a felony.

**69.** For a description of 31 C.F.R. pt. 595, *see supra* Part IV.

**70.** For a description of 31 C.F.R. pt. 545, *see supra* Part IV.

*Dennis*, 341 U.S. at 581, 71 S.Ct. 857 (Douglas, J., dissenting). Well-reasoned circuit authority echoes Justice Douglas's sentiment.[71] This point may be even more simply stated: The First Amendment's guarantee of associational freedom is no license to supply terrorist organizations with resources or material support in any form, including services as a combatant. Those who choose to furnish such material support to terrorists cannot hide or shield their conduct behind the First Amendment.

This conclusion finds support in long-standing Supreme Court precedent upholding the government's authority to place restrictions or outright bans on dealings with foreign entities that have acted against United States interests. Such restrictions and bans—much like those at issue here—have long been upheld by the Supreme Court against constitutional attacks.[72] Lower courts have likewise rejected arguments that restrictions on dealings with hostile foreign nations—designed to deprive such regimes of resources—violate First Amendment rights.[73] Also worth noting in these cases is that the foreign origin of the entities involved was critical to the legal analysis, even though restrictions were placed on the activities of U.S. citizens. For example, the Supreme

**71.** *See United States v. Matthews*, 209 F.3d 338, 342 (4th Cir.2000) ("[T]he Constitution permits limitations on speech . . . that constitutes no essential part of any exposition of ideas.") (internal quotation marks omitted); *Rice v. Paladin Enterprises, Inc.*, 128 F.3d 233, 249 (4th Cir.1997) (holding that aiding and assisting "speech" in the form of a "hit man" instruction book bore no resemblance to the "forms of discourse critical of the government, its policies, and its leaders, which have always animated . . . the First Amendment"); *American Life League, Inc. v. Reno*, 47 F.3d 642, 648 (4th Cir.1995) ("The use of force or violence is outside the scope of First Amendment protection.").

**72.** For example, in *Regan v. Wald*, 468 U.S. 222, 104 S.Ct. 3026, 82 L.Ed.2d 171 (1984), the Supreme Court upheld a prohibition on dealings with Cuba. The plaintiffs there contended that restrictions imposed by the President on transactions with Cuba violated their right to travel, protected by the Due Process Clause of the Fifth Amendment. The Supreme Court rejected that claim, holding that "[m]atters relating to the conduct of foreign relations . . . are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference." *Id.* at 242, 104 S.Ct. 3026. The Court found that the Executive's restrictions on dealings with Cuba must be sustained because of "the President's decision to curtail the flow of hard currency to Cuba—currency that could then be used in support of Cuban adventurism—by restricting travel." *Id.* at 243, 104 S.Ct. 3026. *Regan* was not the first

case in which the Supreme Court upheld such bans. Years earlier, in *Zemel v. Rusk*, 381 U.S. 1, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965), the Supreme Court recognized the Fifth Amendment right to travel, but nonetheless upheld the Secretary of State's refusal to validate an American citizen's passport for a journey to Cuba. Although the citizen had argued that the travel ban violated his First Amendment rights, Chief Justice Warren explained that the government's act was best seen as a mere "inhibition of action." *Id.* at 16, 85 S.Ct. 1271.

**73.** *See Freedom to Travel Campaign v. Newcomb*, 82 F.3d 1431 (9th Cir.1996) (upholding Cuban travel ban against First and Fifth Amendment attacks, noting that "[t]he purpose of the travel ban is the same now as it has been since the ban was imposed almost 35 years ago—to restrict the flow of hard currency into Cuba"); *Walsh v. Brady*, 927 F.2d 1229 (D.C.Cir.1991) (denying First Amendment challenge to prohibition against payments to Cuba); *Veterans and Reservists for Peace in Vietnam v. Regional Commissioner of Customs*, 459 F.2d 676 (3d Cir.1972) (upholding Trading with the Enemy Act and Foreign Assets Control Regulations against First Amendment attack); *Farrakhan v. Reagan*, 669 F.Supp. 506 (D.D.C.1987) (rejecting a First Amendment claim by an organization wishing to transfer funds to Libya, in violation of economic sanctions regulations), *aff'd without opin.*, 851 F.2d 1500 (D.C.Cir.1988).

Court emphasized the importance of the foreign nature of the organization involved in *Communist Party of the United States v. Subversive Activities Control Board*, 367 U.S. 1, 95–96, 81 S.Ct. 1357, 6 L.Ed.2d 625 (1961), explaining that Congress must be able to resist foreign encroachments even if that resistance is accomplished by regulating the domestic activities of entities dominated by foreign powers. *See id.* Thus, the Supreme Court rejected a First Amendment challenge to the restriction, emphatically rejecting the suggestion that it was thereby permitting the imposition of burdens against a domestic group because of the group's unpopular views. *See id.* at 104, 81 S.Ct. 1357. Just as the foreign aspect of the case was central to the denial of the First Amendment claim in *Subversive Activities Control Board*, the foreign relations aspect of this case is critical here as well. *See also Unidyne Corp. v. Government of Iran*, 512 F.Supp. 705, 710 (E.D.Va.1981) (holding, in an IEEPA case, that "[t]he valid exercise of the President's constitutional power in the sphere of foreign relations has the force of law and is to be applied by the courts as the law of the land").

Of course, *Regan* and the related cases determined that the government can ban trade with, or travel to a foreign nation, but they did not address similar restrictions with foreign international organizations such as those with which Lindh is alleged to have affiliated. Yet, there is no principled reason for according different constitutional treatment to restrictions on supplying goods or services to a foreign entity depending on whether the entity is a hostile foreign nation or an international terrorist organization and its host state. If the First Amendment is not offended in one case, it is similarly not offended in the other.

The most apposite authority on the issue is *Humanitarian Law Project v. Reno*, 205 F.3d 1130, 1133–34 (9th Cir.2000), *cert. denied*, 532 U.S. 904, 121 S.Ct. 1226, 149 L.Ed.2d 136 (2001), where a Ninth Circuit panel squarely rejected a constitutional challenge to the "material support or resources" prohibition of Section 2339B. There, the court resisted any analogy to cases based on association alone, noting that Section 2339B and related laws do "not prohibit being a member of one of the designated groups or vigorously promoting and supporting the political goals of the group." *Id.* at 1133. Rather, "[p]laintiffs are even free to praise the groups for using terrorism as a means of achieving their ends." *Id.* What is prohibited by the statute is, in the court's words, "the act of giving material support." *Id.* For this act, the court went on,

> [t]here is no constitutional right to facilitate terrorism by giving terrorists the weapons and explosives with which to carry out their grisly missions. Nor, of course, is there a right to provide resources with which terrorists can buy weapons and explosives.

*Id.* The court also rejected the notion—essential to Lindh's argument here—that the "material support or resources" prohibition was unconstitutional because it proscribed providing material support even if the donor did not have the specific intent to aid in the organization's unlawful purposes. *Id.* at 1134 (holding that "[a]dvocacy is always protected under the First Amendment whereas making donations is protected only in certain contexts"); *see also Boim v. Quranic Literacy Inst.*, 291 F.3d 1000, 1023–24 (7th Cir.2002) (holding that "[t]here is no constitutional right to provide weapons and explosives to terrorists, nor is there any right to provide the resources with which the terrorists can purchase weapons and explosives").

Unable to distinguish *Humanitarian Law Project*, Lindh argues instead that he

is not a member of al Qaeda's "personnel" as defined by Section 2339B. Lindh maintains that providing "personnel" to HUM and al Qaeda could in certain instances amount to nothing more than the mere act of being physically present among members of a designated organization, obtaining information and training from such members, or simply being a member. Put differently, according to Lindh, allowing a prosecution under Section 2339B for providing "personnel" to a terrorist organization presents a constitutionally unacceptable risk that a mere bystander, sympathizer, or passive member will be convicted on the basis of association alone. This argument founders on the plain meaning of the term "personnel," which means "a body of persons usu[ally] employed (as in a factory, office, or organization)," [74] or "a body of persons employed in some service." [75] Thus, in Section 2339B, providing "personnel" to HUM or al Qaeda necessarily means that the persons provided to the foreign terrorist organization work under the direction and control of that organization. One who is merely present with other members of the organization, but is not under the organization's direction and control, is not part of the organization's "personnel." This distinction is sound; one can become a member of a political party without also becoming part of its "personnel;" one can visit an organization's training center, or actively espouse its cause, without thereby becoming "personnel."

Simply put, the term "personnel" does not extend to independent actors. Rather, it describes employees or employee-like operatives who serve the designated group and work at its command or, in Lindh's case, who provide themselves to serve the organization. [76]

Lindh also argues that Section 2339B and the IEEPA Regulations are facially unconstitutionally overbroad, as Section 2339B's prohibition of providing "personnel" penalizes mere association and the IEEPA Regulations' ban on the provision of "services" sweeps a substantial amount of protected conduct within its prohibitions. This argument is meritless. As an initial matter, to prevail on a facial challenge to a statute or regulation, it is not enough for a party to show merely "some" overbreadth. *See Ashcroft v. ACLU,* —— U.S. ——, 122 S.Ct. 1700, 1713, 152 L.Ed.2d 771 (2002). Rather, "the overbreadth of a statute must not only be real, but substantial as well." *Broadrick v. Oklahoma,* 413 U.S. 601, 615, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973). Lindh fails to show either (i) that Section 2339B's prohibition on the provision of "personnel" to foreign terrorist organizations reaches a substantial amount of constitutionally protected activity, or (ii) that the statute cannot be construed to avoid such constitutional difficulties. *See id.* As noted, the term "personnel" entails more than mere presence. Indeed, a person can circulate a pamphlet or give a speech in support of an organization without also working within

74. *Webster's Ninth New Collegiate Dictionary* 878 (1989).

75. *Bakal Bros., Inc. v. United States,* 105 F.3d 1085, 1089 (6th Cir.1997) (quoting *Webster's Third New International Dictionary* 1687 (1971)).

76. Thus, Lindh's contention that "[i]f one were prohibited from giving 'himself', he would be unable to associate at all," so that "[t]he freedom of association would be rendered meaningless," is nonsense. Def.Mem. at 12. One can readily associate with others without also committing himself to the direction or control of the organization. Far from rendering the freedom of association "meaningless," Section 2339B's prohibition on the providing of "personnel" merely reflects the sensible conclusion inherent in the plain meaning of the statute, namely that providing human resources to terrorists is as inimical to the national security as providing other kinds of resources.

the organization's body of "personnel." "Personnel" refers to individuals who function as employees or quasi-employees—those who serve under the foreign entity's direction or control. So construed, and when any potential overbreadth is "judged in relation to the statute's plainly legitimate sweep,"[77] there is no danger, let alone a substantial one, that Section 2339B will be applied to infringe upon legitimate rights of association.

The same conclusion follows with respect to Lindh's overbreadth challenge to the IEEPA Regulations, which prohibit the provision of "services" to designated terrorists and the Taliban. The Regulations do not prohibit association, advocacy, or membership; they merely ban transactions with the identified foreign organization. Given the Regulations' detailed exemptions for personal communications, informational materials, and the like, Lindh has failed to demonstrate any constitutionally significant or substantial overbreadth in the Regulations, and there is, accordingly, no basis to invalidate them.

Lindh also argues that Section 2339B and the IEEPA Regulations are unconstitutionally vague. The vagueness doctrine, which protects both free speech and due process values, is "concerned with clarity;"[78] it "requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *United States v. Sun*, 278 F.3d 302, 309 (4th Cir.2002) (quoting *Kolender v. Lawson*, 461 U.S. 352, 357, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983)). Of course, the Constitution does not impose "impossible standards of clarity" on Congress or the regulatory agencies. *See United States v. Mento*, 231 F.3d 912, 922 (4th Cir.2000), *vacated on other grounds.* —— U.S. ——, 122 S.Ct. 1602, 152 L.Ed.2d 617 (2002). Also important to note is that "[a] scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982)..

In support of his vagueness argument, Lindh relies principally on the Ninth Circuit's decision in *Humanitarian Law Project*, 205 F.3d at 1137–38, where the Ninth Circuit concluded that the district court did not abuse its discretion in issuing a limited preliminary injunction on vagueness grounds regarding the term "personnel." The Ninth Circuit stated, "[i]t is easy to see how someone could be unsure about what [Section 2339B] prohibits with the use of the term 'personnel,' as it blurs the line between protected expression and unprotected conduct." *Id.* at 1137. The court observed that someone who advocates the cause of a terrorist organization "could be seen as supplying them with personnel," particularly since "having an independent advocate frees up members to engage in terrorist activities instead of advocacy." *Id.* In response to the government's argument that "personnel" should be construed to extend only to a person's service "under the direction or control" of the terrorist organization, the Ninth Circuit declined to do so on the ground that it was "not authorized to rewrite the law so it will pass constitutional muster," and upheld the preliminary injunction in issue. *Id.* at 1137–38.

---

**77.** *See United States v. Mento*, 231 F.3d 912, 921 (4th Cir.2000), *vacated on other grounds*, —— U.S. ——, 122 S.Ct. 1602, 152 L.Ed.2d 617 (2002).

**78.** *American Life League*, 47 F.3d at 653.

As already noted, the plain meaning of "personnel" is such that it requires, in the context of Section 2339B, an employment or employment-like relationship between the persons in question and the terrorist organization. The Ninth Circuit's vagueness holding in *Humanitarian Law Project* is neither persuasive nor controlling. The term is aimed at denying the provision of human resources to proscribed terrorist organizations, and not at the mere *independent* advocacy of an organization's interests or agenda. Thus, the term "personnel" in Section 2339B gives fair notice to the public of what is prohibited and the provision is therefore not unconstitutionally vague.

Lindh's final vagueness argument focuses on the Regulations' prohibition on providing "services" to terrorist organizations. *See* 31 C.F.R. §§ 545.204, 545.206(b), 595.204, 595.205. This argument also fails because the prohibition is set forth "with sufficient definiteness that an ordinary person could understand what conduct was prohibited." *United States v. Arch Trading Co.*, 987 F.2d 1087, 1094 (4th Cir.1993) (upholding IEEPA executive orders against vagueness challenge). The obvious scope and purpose of the Regulations is to ban most transactions between U.S. persons and al Qaeda and the Taliban, with certain limited exceptions. *See United States v. Ehsan*, 163 F.3d 855, 859 (4th Cir.1998) (upholding Iranian Transactions Regulations under IEEPA against vagueness challenges; "obvious purpose" of executive order was "to isolate Iran from trade with the United States").

Lindh's vagueness challenges fail for an additional reason. The crimes with which Lindh is charged in Counts Six through Nine require proof of specific intent. *See* 50 U.S.C. § 1705(b) (requiring "willful" violation of regulations); *Bryan v. United States*, 524 U.S. 184, 118 S.Ct. 1939, 141 L.Ed.2d 197 (1998) (requiring proof that the defendant knew his conduct was unlawful, but not that he knew of federal statutory scheme). And, it is well settled that "a requirement of willfulness makes a vagueness challenge especially difficult to sustain," [79] because "[a] mind intent on willful evasion is inconsistent with surprised innocence." [80] In light of the Fourth Circuit's holdings in *Arch Trading Co.* and *Ehsan*, and because the regulatory violations in this case require proof that Lindh acted willfully in providing services to al Qaeda and the Taliban, his vagueness challenge to IEEPA Regulations fails.

## VII.

Lindh's penultimate argument seeks dismissal of Counts Two through Five of the Indictment, pursuant to Rule 12, Fed. R.Crim.P. These counts charge Lindh with four distinct violations of 18 U.S.C. § 2339B, which, in pertinent part, provides criminal penalties for "[w]hoever within the United States or subject to the jurisdiction of the United States, knowingly provides material support or resources [81]

---

**79.** *United States v. Hescorp*, 801 F.2d 70, 77 (2d Cir.1986) (upholding IEEPA regulations).

**80.** *United States v. Ragen*, 314 U.S. 513, 524, 62 S.Ct. 374, 86 L.Ed. 383 (1942); *see also Posters 'N' Things, Ltd. v. United States*, 511 U.S. 513, 526, 114 S.Ct. 1747, 128 L.Ed.2d 539 (1994) (holding that a *scienter* requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice that the conduct is proscribed).

**81.** Section 2339B incorporates the definition of "material support or resources" provided in 18 U.S.C. § 2339A, which prohibits the provision of material support or resources for use in connection with a terrorist act. *Id.* § 2339B(g)(4). As defined in that section, "material support or resources" means "currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons,

to a foreign terrorist organization,[82] or attempts or conspires to do so." Lindh argues for dismissal of these counts on grounds (i) that the Indictment is insufficient on its face; and (ii) that his alleged conduct does not violate Section 2339B.

 A motion to dismiss an indictment "tests whether the indictment sufficiently charges the offense set forth against defendant." *United States v. Brandon,* 150 F.Supp.2d 883, 884 (E.D.Va. 2001); *see also United States v. Sampson,* 371 U.S. 75, 78–79, 83 S.Ct. 173, 9 L.Ed.2d 136 (1962). In this respect, the standard an indictment must meet is found in Rule 7(c)(1), Fed.R.Crim.P., which provides that "[t]he indictment or the information shall be a plain, concise and definite written statement of the essential facts constituting the offense charged.... It need not contain a formal commencement, a formal conclusion or any other matter not necessary to such a statement." More particularly, it is generally settled that "if an indictment sets forth the essential elements of [an] offense in sufficient detail so as fairly to inform the defendant of the nature of the charge, then it is immune

from attack on a motion to dismiss." *Brandon,* 150 F.Supp.2d at 884; *see also United States v. Darby,* 37 F.3d 1059, 1063 (4th Cir.1994). And, to give a defendant sufficient notice of the charges against him, the indictment need only track the language of the statute at issue. *See United States v. Wicks,* 187 F.3d 426, 427 (4th Cir.1999); *United States v. Smith,* 44 F.3d 1259, 1264 (4th Cir.1995); *United States v. Fogel,* 901 F.2d 23, 25 (4th Cir.1990). An indictment satisfies the constitutional guarantees of the Fifth and Sixth Amendments "if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Wicks,* 187 F.3d at 427 (quoting *Hamling v. United States,* 418 U.S. 87, 117, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974)).

 These principles, applied here, compel the conclusion that Lindh's motion to dismiss Counts Two through Five of the Indictment as insufficient must fail. Each two-paragraph count of the Indictment begins by realleging and incorporating by

lethal substances, explosives, personnel, transportation, and other physical assets, except medicine or religious materials." *Id.* § 2339A(b). This section was amended by the USA Patriot Act so that the phrase "currency or monetary instruments or financial securities" replaced "currency or other financial securities" in the definition, and the term "expert advice or assistance" was added. *See* USA Patriot Act, Pub.L. No. 107–56, § 805(a)(2), 115 Stat. 272, 377 (Oct. 26, 2001). These amendments are not at issue in this motion. The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), codified at 18 U.S.C. § 2339B, also modified the existing definition of "material support or resources" in Section 2339A to reflect the findings and purpose of the legislation. The definition previously excluded "humanitarian assistance to persons not directly involved in such violations" from the list of items defined as constituting "material support or re-

sources." *See* Violent Crime Control and Law Enforcement Act of 1994, Pub.L. No. 103–322, § 120005, 108 Stat. 1796, 2022 (Sept. 13, 1994) (original version of statute). The AEDPA eliminated this exclusion in favor of a narrower exemption for "medicine and religious materials." AEDPA, § 322, 110 Stat. at 1255. The House Conference Report emphasized that "medicine" was "limited to medicine itself, and does not include the vast array of medical supplies," and that "religious materials" did not include "anything that could be used to cause physical injury to any person." H.R.Conf. Rep. No. 104–518, at 114 (1996), *reprinted in* 1996 U.S.C.C.A.N. 924, 947.

82. A "foreign terrorist organization" for purposes of the statute is one so designated by the Secretary of State pursuant to the provisions of Section 219 of the Immigration and Nationality Act. 18 U.S.C. § 2339B(g)(6).

reference all ten paragraphs of the general allegations and all 21 overt acts alleged in Count One.[83] In the second paragraph of each Count may be found all the essential elements of the Section 2339B offenses, the approximate dates on which Lindh allegedly committed the offenses, and the foreign terrorist organization he is alleged to have assisted. These general allegations describe HUM and al Qaeda in some detail, and specifically allege their respective designations as foreign terrorist organizations. Thus, "on its face, the Indictment clearly passes muster under the applicable legal standard, as it sets forth the essential elements of the offenses in a manner that fairly informs [defendant] of the nature of the charges against [him]." *Brandon,* 150 F.Supp.2d at 885; *see also United States v. American Waste Fibers Co.,* 809 F.2d 1044, 1046–47 (4th Cir.1987) (holding that the indictment was sufficiently detailed as it "alert[ed] [defendant] to the elements of the offenses by following the language of the statute" and listed several overt acts "together with locations and dates").

A second argument in support of Lindh's motion to dismiss is that his alleged conduct does not violate Section 2339B. There are two conclusive responses to this contention. First, the Indictment plainly and adequately charges a violation of Section 2339B. And, as noted above, it does so in the required degree of detail so as fairly to apprise Lindh of the nature of the charges against him.[84] There is no requirement for the government to detail its evidence in the Indictment. Lindh's argument is essentially that the evidence will not bear out the charges. This argument is premature; a pre-trial motion to dismiss under Rule 12(b). Fed.R.Crim.P.,[85] "cannot be based on a sufficiency of the evidence argument because such an argument raises factual questions embraced in the general issue." *United States v. Ayarza–Garcia,* 819 F.2d 1043, 1048 (11th Cir.1987).[86]

**83.** The second paragraph of each count then tracks the statutory or regulatory language, with variations concerning the dates, the nature of the charge (substantive or conspiracy), and the foreign organization involved. Thus, paragraph two of Count Two reads as follows:

> From in or about May 2001 through in or about June 2001, the defendant. JOHN PHILLIP WALKER LINDH, subject to the jurisdiction of the United States, but outside of the jurisdiction of any particular state or district, with other persons known and unknown to the Grand Jury, did knowingly conspire to knowingly provide material support and resources, as that term is defined in 18 U.S.C. § 2339A(b), to a foreign terrorist organization, namely Harakat ul-Mujahideen ("HUM"). (In violation of 18 U.S.C. § 2339B.)

Indictment, p. 10. Count Three reads the same as Count Two, except that the second paragraph alleges that Lindh "did knowingly provide and attempt to provide material support and resources," rather than conspire with others to do so. *Id.* Count Four, like Count Two, is a conspiracy provision, except that it charges Lindh with conspiring with others over the period from May 2001 through December 2001 to provide material support and resources to al Qaeda. *See* Indictment, p. 11. Finally, Count Five charges that Lindh committed the substantive offense of providing and attempting to provide material support and resources to al Qaeda during the same time period as alleged in Count Four. *See id.*

**84.** Lindh's motion for a bill of particulars, which sought just that type of detail, has already been denied. *See United States v. Lindh,* Criminal No. 02–37–A (E.D.Va. April 1, 2002) (Order).

**85.** Rule 12, Fed.R.Crim.P., provides that "[a]ny defense, objection, or request which is capable of determination without the trial of the general issue may be raised before trial by motion." *United States v. Ayarza–Garcia,* 819 F.2d 1043, 1048 (11th Cir.1987).

**86.** *See also United States v. Terry,* 257 F.3d 366, 372 (4th Cir.) (King., J., concurring), *cert. denied,* —— U.S. ——, 122 S.Ct. 579, 151 L.Ed.2d 451 (2001); *United States v. Galla-*

The second conclusive response is that Section 2339B's plain language covers Lindh's alleged conduct. *See supra* Part VI. As noted previously, this plain language trumps any suggestion in the legislative history that the provision is limited to proscribing commercial transactions. *See supra* Part VI. Lindh contends his conduct does not, as a matter of law, amount to providing "material support and resources," including "training" and "personnel," because he provided no training and that merely enlisting in an armed force—rather than recruiting for such a force—does not constitute providing personnel. Lindh is incorrect on both arguments.

First, the government has indicated that it may well attempt to show that Lindh provided training. Second, assuming the government fails in this respect, Lindh's conduct as a participant in the training camp and battlefield falls squarely within Section 2339B's proscription against providing support and services, including "personnel." There is little doubt, given the plain meaning of "Personnel"[87] that Lindh provided such support and services.

Citing the legislative history, Lindh contends that the term "personnel" is limited to recruitment. This contention is flatly controverted by the term's plain meaning. Indeed, under any reasonable construction of Section 2339B's statutory language, a person who joins the armed force of a foreign terrorist organization, receives combat training from that organization, and serves in a combat unit to protect the organization and advance its goals has provided material support and resources—including, specifically, "personnel"—to that group. By any measure, Lindh provided personnel, *i.e.*, himself, to al Qaeda and HUM when he allegedly joined these organizations and engaged in a variety of conduct, including combat, to further the goals of these organizations. Thus, to provide personnel is to provide people who become affiliated with the organization and work under its direction: the individual or individuals provided could be the provider himself, or others, or both.

Finally, Lindh asks the Court to construe Section 2339B narrowly, given the constitutional doubt doctrine and the rule of lenity. Neither doctrine applies in this

---

*gher,* 602 F.2d 1139, 1142 (3d Cir.1979); *United States v. King,* 581 F.2d 800, 802 (10th Cir.1978) (dismissing charging instrument on basis that "[defendants'] conduct did not constitute a violation of the statute charged" was improper, because it was "in effect a determination of guilt made at a point in the proceedings when the district judge was without jurisdiction to render it"); 24 *Moore's Federal Practice* § 612.02, at 612–18 (3d ed. 1987) ("A Rule 12(b) motion to dismiss is not the proper way to raise a factual defense.").

**87.** The dictionary definition of the term "personnel" is "a body of persons usually employed (as in a factory, office, or organization)" or "a body of persons employed in some service." *See supra* Part VI; *see also United States v. Maxwell,* 285 F.3d 336, 341 (4th Cir.2002) (holding that where a particular term is undefined within a statute, "we turn to its dictionary definition for its com-

mon meaning".) These definitions are consistent with the interpretation provided by the United States Attorney's Manual: "There are two different ways of providing 'personnel' to a designated foreign terrorist organization: 1) by working under the direction or control of the organization: or 2) by recruiting another to work under its direction or control. The statute encompasses both methods, so long as the requisite direction or control is present." U.S.A.M. § 9–9–91.100 (2001). The broad reading of the term "personnel" is also consistent with the Findings and Purpose of AEDPA, which provide that the statute is to be interpreted broadly, "to provide the Federal Government the fullest possible basis, consistent with the Constitution, to prevent persons within the United States, or subject to the jurisdiction of the United States, from providing material support or resources to foreign organizations that engage in terrorist activities." AEDPA § 301(b), 110 Stat. at 1247.

case, however, because the statute is not ambiguous. *See United States v. Photogrammetric Data Services,* 259 F.3d 229, 252 (4th Cir.2001) ("Because we find the language of the[ ] statute to be unambiguous, ... the rule of constitutional doubt raised by appellants is likewise inapplicable."), *cert. denied,* —— U.S. ——, 122 S.Ct. 1295, 152 L.Ed.2d 208 (2002); *Clifford,* 197 F.Supp.2d at 522 (holding that the rule of lenity will not apply unless a statute's plain language is ambiguous).

## VIII.

Lindh finally argues for dismissal of Count Ten, which charges him with using and carrying firearms and destructive devices in furtherance of crimes of violence, in violation of 18 U.S.C. §§ 924(c) & 2. Lindh claims that Count Ten must be dismissed because the underlying crimes charged in Counts Four through Nine, which concern his providing material support and resources and supplying services to the Taliban and al Qaeda, are not crimes of violence.

An analysis of whether Count Ten should be dismissed begins with the charging statute and its corresponding definition of "crime of violence." Section 924(c)(1)(A) provides that "any person who, during and in relation to any crime of violence ..., uses or carries a firearm, or who in furtherance of any such crime, possesses a firearm," shall receive a term of imprisonment "in addition to the punishment provided for such crimes of violence." And, a crime of violence is defined in this context as a felony "that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." 18 U.S.C. § 924(c)(3)(B). In *United States v. Aragon,* 983 F.2d 1306, 1312 (4th·Cir.1993), the Fourth Circuit found that identical language in 18 U.S.C. § 16(b)

> directs the court to look to the generic nature of an offense in deciding whether the offense is a 'crime of violence'.... [T]he language 'by its nature' relates to the *intrinsic* nature of the crime, not to the facts of each individual commission of the offense.

(emphasis in the original). According to the Fourth Circuit, the language of Section 16(b) "mandates that the court embark upon a categorical approach to determine whether a particular crime, 'by its nature,' qualifies as a 'crime of violence.'" *Aragon,* 983 F.2d at 1313; *see also Taylor v. United States,* 495 U.S. 575, 110 S.Ct. 2143, 109 L.Ed.2d 607 (1990).[88] Thus, whether Counts Four through Nine qualify as crimes of violence turns on whether they intrinsically, categorically, and by their nature involve a substantial risk of physical force against the person or property of another.

---

**88.** In *Taylor,* the Court was faced with determining the meaning of the term "burglary" as used in the definition of "violent felony" with respect to 18 U.S.C. § 924(e). That section provides a sentencing enhancement for an individual convicted of unlawful possession of a firearm, in violation of 18 U.S.C. § 922(g), who has three prior convictions of specified types of offenses, including burglary. *See* 18 U.S.C. § 924(g)(2)(B)(ii). Because the elements of the state crimes of "burglary" varied widely, the Supreme Court held that a "categorical approach" was appropriate, where the sentencing court would determine whether the prior nominal "burglary" conviction had all the elements of a "generic" burglary: "an unlawful or unprivileged entry into, or remaining in a building or other structure, with intent to commit a crime." 495 U.S. at 598, 110 S.Ct. 2143. This categorical approach "generally requires the trial court to look only to the fact of conviction and the statutory definition of the prior offense." *Id.* at 601, 110 S.Ct. 2143. Even this approach, however, permits the court to look to the charging document and jury instructions to determine whether "the jury was actually required to find all the elements of generic burglary." *Id.*

█ Count Four charges Lindh with conspiring knowingly to provide material support and resources to a foreign terrorist organization, namely al Qaeda,[89] in violation of 18 U.S.C. § 2339B,[90] Count Five charges the substantive offense, also in violation of Section 2339B. Both of these crimes are, by their nature, crimes of violence. Providing material support or resources to a terrorist organization—which may include "weapons, lethal substances, [or] explosives," but may be just as deadly if it is "currency or monetary instruments" [91]—is categorically a crime of violence, as Congress recognized when it enacted Section 2339B.[92] Furthermore, Congress was clearly mindful of the violent nature of this crime because it im-

posed greater penalties "if the death of any person results." *See id.* Simply put, when one provides material support or resources to a terrorist organization, there is a "substantial risk that physical force against the person or property of another *may* be used in the course of committing the offense." 18 U.S.C. § 924(c)(3)(B) (emphasis added). The phrase "in the course of committing the offense" does not mean, as Lindh suggests, that courts must be blind to the natural consequences—the natural *risks* —attendant to the aiding and abetting of terrorism proscribed by Section 2339B.[93] Rather, the statute requires assessment of the risks that may result from providing material support or resources to terrorists in a manner that Sec-

89. In October 1999 and October 2001, the Secretary of State of the United States designated al Qaeda as a foreign terrorist organization. *See* 64 Fed.Reg. 55112 (1999); 66 Fed. Reg. 51088 (2001). This designation required a finding by the Secretary that, *inter alia,* al Qaeda "engages in terrorist activity ... or terrorism" and that "the terrorist activity or terrorism ... threatens the security of United States nationals or the national security of the United States." 8 U.S.C. § 1189(a)(1). To "engage in terrorist activity" means, *inter alia,* "to commit or to incite to commit, under circumstances indicating an intention to cause death or serious bodily injury, a terrorist activity." 8 U.S.C. § 1182(a)(3)(B)(iv). "Terrorist activity" includes such activities as "highjacking or sabotage;" "seizing or detaining, and threatening to kill, injure, or continue to detain, another individual;" a "violent attack upon an internationally protected person;" "an assassination; or the use of any biological agent, chemical agent, or nuclear weapon or device" or "explosive, firearm, or other weapon or dangerous device." 8 U.S.C. § 1182(a)(3)(B)(iii). Similarly, "terrorism" means "premeditated, politically motivated violence perpetrated against noncombatant targets." 22 U.S.C. § 2656f(d)(2).

90. Section 2339B provides:
Whoever ... knowingly provides material support or resources to a foreign terrorist organization, or *attempts or conspires to do so,* shall be fined under this title or impris-

oned not more than 15 years, or both, and if the death of any person results, shall be imprisoned for any term of years or for life. 18 U.S.C. § 2339B(a)(1).

91. 18 U.S.C. § 2339A(b).

92. Congress found that "international terrorism is a serious and deadly problem that threatens the vital interests of the United States," and that "foreign organizations that engage in terrorist activities are so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct." Pub.L. No. 104–132, § 301(a)(1) & (7), 110 Stat. 1250 (1996), *reprinted in* 18 U.S.C. § 2339B note. Also pertinent is that the statutory definitions of "international terrorism" and "domestic terrorism" in the Chapter that includes Section 2339B involve, respectively, "violent acts or acts dangerous to human life" and "acts dangerous to human life." 18 U.S.C. §§ 2331(1)(A) and (5)(A).

93. *See United States v. Dunn,* 946 F.2d 615, 621 (9th Cir.1991) (holding that the mere possession of a sawed-off shotgun is a crime of violence because "Congress has found [it] to be inherently dangerous and generally lacking usefulness, except for violent criminal purposes"); *United States v. Amparo,* 68 F.3d 1222, 1225 (9th Cir.1995) (holding that possession of a disassembled and unloaded sawed-off shotgun was a crime of violence).

tion 2339B forbids. *See Aragon*, 983 F.2d at 1313. It takes little imagination to conclude that providing material support and resources to a terrorist organization creates a substantial risk that the violent aims of the terrorists will be realized. Violence, therefore, is intrinsic to the crimes with which Lindh is charged.

Analogous authority supports this result. Thus, providing support to a terrorist organization in violation of Section 2339B is analogous to conspiracies to commit crimes of violence, which courts have uniformly held to be crimes of violence, even though "the offense is complete upon reaching an agreement without the use of any force." *United States v. Greer*, 939 F.2d 1076, 1099 (5th Cir.1991). *See also United States v. Ward*, 171 F.3d 188, 192–93 (4th Cir.1999); *United States v. Chimurenga*, 760 F.2d 400, 403–04 (2d Cir.1985). Like a conspiracy, a terrorist organization "provides a focal point for collective criminal action," and knowingly providing material support and resources to such an organization "increases the chances that the planned crime will be committed beyond that of a mere possibility" and is therefore an act involving a "substantial risk" of violence. *Chimurenga*, 760 F.2d at 404. Just as committing a nonviolent overt act in furtherance of a violent conspiracy may constitute a crime of violence, so too can a nonviolent act in support of violent terrorist activities. *See id.* (holding that conspiracy to commit bank robbery is a crime of violence). Thus, Counts Four and Five are crimes of violence.

Count Six charges Lindh with conspiring to make a contribution of services to a specially designated terrorist, al Qaeda, in violation of 31 C.F.R. §§ 595.204 & 595.206(b) and 50 U.S.C. § 1705(b). Count Seven charges the substantive offense. Section 595.204 provides that

> no U.S. person may deal in property or interests in property of a specially designated terrorist, including the making or receiving of any contribution of funds, goods, or services to or for the benefit of a specially designated terrorist.[94]

A "specially designated terrorist" is defined in 31 C.F.R. § 595.311 to include persons listed in the annex to Executive Order 12947, 60 Fed.Reg. 5079 (1995), which includes al Qaeda.[95] Count Eight charges Lindh with conspiring to supply services to the Taliban,[96] in violation of 31 C.F.R. § 545.204 & 545.206(b) and 50 U.S.C. § 1705(b). Count Nine charges the substantive offense. Section 545.204 provides:

> the exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a U.S. person, wherever located, of any goods, software, technology (including technical data), or services to the territory of Afghanistan controlled by the Taliban or to the Taliban or to persons whose property or interests in property are blocked pursuant to § 545.201 is prohibited.[97]

Section 595.204 and 595.206 implement Executive Order 13129, in which the President found:

**94.** Section 595.205 prohibits, *inter alia*, conspiracies to violate section 595.204.

**95.** *See* Exec. Order 13099, 63 Fed.Reg. 45167 (1998).

**96.** In July 1999, in light of "the actions and policies of the Taliban ... in allowing territory under its control in Afghanistan to be used

as a safe haven and base of operations for" al Qaeda, the President issued Executive Order 13129 blocking transactions with the Taliban. These prohibitions were subsequently codified in 31 C.F.R. pt. 545.

**97.** The Taliban is listed in the blocking provisions of Section 545.201. *See* 31 C.F.R. § 545.201(a)(1).

the actions and policies of the Taliban in Afghanistan, in allowing territory under its control in Afghanistan to be used as a safe haven and base of operations for Usama bin Laden and the Al–Qaeda organization, who have committed and threatened to continue to commit acts of violence against the United States and its nationals, constitute an unusual and extraordinary threat to the national security ... of the United States.

Exec. Order 13129, 64 Fed.Reg. 36759 (1999). As with violations of 18 U.S.C. § 2339B, providing services to terrorists, and to those who provide terrorists safe haven and a base of operations, is intrinsically a crime of violence.[98]

Even assuming some doubt that providing material support and resources to a foreign terrorist organization is, categorically, a crime of violence, this would not end the inquiry. Instead, in those circumstances, it is permissible to examine the Indictment's allegations for whatever light they may shed on the violent nature of the crimes alleged.[99] Such an examination leaves no doubt that Counts Four through Nine are indeed crimes of violence. So that even assuming, hypothetically, that there are instances of providing support to a foreign terrorist organization that may not involve a risk of violence, e.g., delivery of milk or the morning newspaper to these organizations, this does not defeat the government's contention that Lindh's alleged actions are crimes of violence. No such non-violent forms of material support or resources are alleged in the Indictment. Rather, Lindh is charged with crossing into Afghanistan "for the purpose of taking up arms with the Taliban." Indictment, p. 7, ¶ 6. It is alleged that he told Taliban personnel at a recruiting center "that he wanted to go to the front lines to fight." Indictment, p. 7, ¶ 7. It is further alleged that Lindh attended an al Qaeda training camp for military training, knowing that a principal purpose of al Qaeda was to fight and kill Americans. Indictment, p. 7, ¶ 8. He allegedly traveled to another training camp and "participated fully in its training activities" after being told that bin Laden

**98.** In support of the argument that he committed no crime of violence, Lindh cites two cases that address different statutory provisions, *United States v. Johnson*, 246 F.3d 330 (4th Cir.2001) and *United States v. Lane*, 252 F.3d 905 (7th Cir.2001). In *Johnson*, the Fourth Circuit evaluated the United States Sentencing Guidelines, which define a crime of violence as conduct that "otherwise involves conduct that presents a serious potential risk of physical injury to another." U.S.S.G. § 4B1.2(a)(2). This language differs from that used in Section 924(c) and, in any event, the crimes alleged here fit as comfortably within U.S.S.G. § 4B1.2 as they do within Section 924(c). In *Lane*, the Seventh Circuit, in addressing whether possession by a felon of a firearm *is* a crime of violence, held that to determine whether a crime of violence has been committed in violation of 18 U.S.C. § 3156(a)(4)(B), a court must ask whether there is a substantial risk that physical force against the person or property of another may be used in the course of committing the offense. *See Lane*, 252 F.3d at 907–08. The court held that a crime that merely increases the likelihood of a crime of violence need not itself be a crime of violence that would bar the defendant's release on bail. *See id.* While the language in issue in *Lane* is similar to that of 924(c), *Lane* in no way contradicts the conclusion reached here that the crimes charged against Lindh in Counts Four through Nine are, by their nature, crimes of violence.

**99.** *See United States v. Cook*, 26 F.3d 507, 509 (4th Cir.1994) (holding that a sentencing court may examine the charging papers and the jury instructions to determine whether the crime for which the jury convicts a defendant was a violent act); *see also United States v. Kennedy*, 133 F.3d 53 (D.C.Cir.1998) (holding that district courts are entitled to look at the indictment to determine whether the charged crime was by its nature a crime of violence pursuant to Section 924(c)(3)(B)); *United States v. Mendez*, 992 F.2d 1488, 1491 (9th Cir.1993) (same).

planned "twenty suicide terrorist operations against the United States and Israel." Indictment, p. 7, ¶ 11. Furthermore, Lindh allegedly "participated in terrorist training courses in, among other things, weapons, orienteering, navigation, explosives and battlefield combat, which included the use of shoulder weapons, pistols, and rocket-propelled grenades, and the construction of Molotov cocktails." Indictment, pp. 7–8, ¶ 12. And finally, Lindh was issued "an AKM rifle, with a barrel suitable for long-range shooting," and for months during his service to al Qaeda and the Taliban, "carried various weapons with him, including the AKM rifle, an RPK rifle ... and at least two grenades." Indictment, p. 8, ¶¶ 16 and 19.

Given these clarifying allegations, it is simply not seriously debatable that the crimes charged against Lindh of supplying services to al Qaeda and the Taliban. *i.e.,* combatant services, are crimes that "by ... [their] nature, involve[ ] a substantial risk that physical force against the person or property of another may be used in the course of committing the offense[s]." 18 U.S.C. § 924(c)(3). Indeed, none of the allegations relevant to the charges would allow a jury to convict Lindh without necessarily concluding that he had provided material support and resources in a manner that involved such a risk of violence. *See Taylor*, 495 U.S. at 602, 110 S.Ct. 2143. Under these circumstances, the violations of 18 U.S.C. § 2339B and the related Regulations as charged in the Indictment are crimes of violence within the meaning of Section 924(c)(3).

In sum, Lindh's motion to dismiss Count Ten must be denied given that the charging statutes and Regulations underlying Counts Four through Nine categorically constitute "crimes of violence," a conclusion confirmed by a review of the alleged

facts in the Indictment pertaining to these counts.

An appropriate Order has issued.